BOTTINI & BOTTINI, INC.
Francis A. Bottini, Jr. (SBN 175783)
fbottini@bottinilaw.com
Albert Y. Chang (SBN 296065)
achang@bottinilaw.com
Yury A. Kolesnikov (SBN 271173)
ykolesnikov@bottinilaw.com
7817 Ivanhoe Avenue, Suite 102
La Jolla, California  92037
Telephone:   (858) 914-2001
Facsimile:   (858) 914-2002

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| KUSUMAM KOSHY, derivatively on behalf of QUALITY SYSTEMS INC., <br><br> Plaintiff, <br><br> vs. <br><br> CRAIG A. BARBAROSH, GEORGE H. BRISTOL, JAMES C. MALONE, PETER M. NEUPERT, MORRIS PANNER, D. RUSSELL PFLUEGER, STEVEN T. PLOCHOCKI, SHELDON RAZIN, LANCE E. ROSENZWEIG, and PAUL A. HOLT, <br><br> Defendants, <br><br> -and- <br><br> QUALITY SYSTEMS INC., <br><br> Nominal Defendant. | Case No. 8:17-cv-01694 <br><br> **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, ABUSE OF CONTROL, UNJUST ENRICHMENT, AND INSIDER SELLING** <br><br><br><br> <u>JURY TRIAL DEMANDED</u> |

Plaintiff Kusumam Koshy ("Plaintiff"), by and through her undersigned attorneys, brings this action derivatively on behalf of nominal defendant Quality Systems, Inc. ("Quality Systems," "QSI," or the "Company") and alleges upon personal knowledge as to herself and her own acts, and as to all other matters based upon the investigation conducted by her attorneys which included, among other things, a review of Securities and Exchange Commission ("SEC") filings, documents, analyst reports, news reports, press releases, and other publicly available information regarding the Company, as follows:

## I.    INTRODUCTION

1.    This is a shareholder derivative action brought on behalf of the Company against certain current and former executive officers and directors of Quality Systems, Inc. seeking to remedy defendants' breaches of fiduciary duties and other violations of the law that occurred from at least May 2010 through July 2015 (the "Relevant Period").

2.    Quality Systems manufactures information systems and practice management software for medical and dental practices. Quality Systems trades on the NASDAQ Stock Exchange ("Nasdaq") under the symbol "QSII". Throughout the Relevant Period, the Individual Defendants (as defined herein) caused or allowed the Company, in its public filings, press releases and communications with analysts, to disseminate factually baseless projections of revenue and earnings growth.

3.    Throughout the Relevant Period, Defendants falsely represented that QSI was experiencing "extraordinary" growth, while at the same time repeatedly claiming that their earnings and revenue guidance – with projected increases as high as 35% – were "conservative" given QSI's "large" and "robust" pipeline of business driven by "unprecedented demand." Defendants further assured investors that they were "confident" in their projections because of their "continuous reforecasting process" and access to real-time sales data in the

Company's Salesforce sales tracking and forecasting database. Based on these representations, analysts also highlighted QSI's "continued growth opportunities," issued consensus estimates in line with, or higher than, the Company's own guidance, and repeatedly recommended that investors purchase the stock based on QSI's track record of meeting or exceeding consensus estimates for earnings. In turn, the Company's stock price increased dramatically, rising 45% from the beginning of 2011 to reach an all-time and Relevant Period high of $50.04 on September 27, 2011.[1]

4.     In reality, however, beginning in early 2011 and continuing throughout the Relevant Period, QSI's sales and sales prospects were severely declining. Contrary to Defendants' representations, the Salesforce data and reports received by the Company's top executives, including the Individual Defendants, showed that as early as April 2011 QSI was not meeting sales targets and that the Company's "pipeline" of sales prospects was drying up.

5.     Despite their knowledge of declining sales and sales prospects, Defendants continued to misrepresent QSI's sales pipeline to dispel any doubt that the market for the Company's health practice management and electronic records software products was flagging. In particular, in May 2011, when analysts questioned whether QSI's growth rates, and the corresponding appreciation in its stock price, were sustainable in light of potential saturation in its principal markets, the Company's most senior executives denied that the Company's business was slowing, and assured investors that QSI would meet and even exceed market expectations for growth.

6.     Similarly, in the fall of 2011, Plochocki, the Company's CEO at the time, dismissed concerns of a slowdown in QSI's business as "baseless," stating

---

[1] All share amounts and per-share prices have been adjusted to reflect the two-for-one stock split on October 26, 2011.

that "[t]here is nothing drying up and there is nothing slowing down." Plochocki further issued guidance which called for QSI to report earnings per share ("EPS") growth of as much as 33% for the FY2012 – a figure that Plochocki underscored was "quite conservative," and which he stated the Company was "very confident" it would achieve.[2]   Indeed, in the Company's SEC filings, the Individual Defendants repeatedly assured investors that QSI's guidance was highly reliable because the Company continually updated the earnings guidance based on real-time data from all QSI's operating divisions, stating that QSI engaged in "a continuous reforecasting process, which incorporates inputs from all operating entities to determine short term and long term expectations." Throughout late 2011 and the end of January 2012, QSI repeatedly affirmed its bullish guidance for FY2012. In response to these materially false and misleading statements, the share price for QSI common stock steadily increased from a closing price of $33.90 per share on November 25, 2011 to a closing price of $44.60 per share on February 23, 2012.

7.    Defendant Plochocki promptly cashed in on QSI's inflated stock price, selling 88,500 shares of QSI stock – nearly 90% of his holdings – on February 24, 2012, for proceeds of nearly $4 million. This massive stock sale was highly suspicious since it was the first sale of stock that Plochocki had made in nearly three and a half years, and it was executed at a price that was near QSI's all-time high and just weeks before the Company closed its FY2012 results.

8.    The Individual Defendants were fully aware of the falsity of the financial statements and financial guidance they caused the Company to disseminate to the market, and breached their fiduciary duties of candor and good faith by making such statements.

---

[2] QSI's FY2012 began on April 1, 2011 and ended on March 31, 2012. Similarly, QSI's FY2013 began on April 1, 2012 and ended on March 31, 2013.

9.     As a result of the Defendants' wrongdoing, QSI, as well as some of the Individual Defendants (Razin, Plochocki, and Holt) were sued for securities fraud in a shareholder class action pending before this Court -- *Deerfield Beach Police Pension Fund v. Quality Systems, Inc., et al.*, Civil Action No. 13-01818 (C.D. Cal.).   The complaint was initially dismissed, but the plaintiffs appealed and, on July 28, 2017, the Ninth Circuit reversed, holding that the plaintiffs had adequately alleged under the heightened pleading standard of the PSLRA that Defendants Razin, Plochocki, and Holt had made materially false statements and acted with scienter in making the false statements.   *See City of Miami v. Quality Systems*, 2017 U.S. App. LEXIS 13708 (9th Cir. July 28, 2017).

10.     During the Relevant Period, the Individual Defendants also falsely represented to the market that QSI had adequate internal controls over financial reporting in place.   In reality, the Individual Defendants knew that QSI lacked adequate internal controls and that the controls that did exist were being intentionally overridden by management, including Plochocki, Razin, and Holt.

11.     Through this shareholder derivative action, Plaintiff seeks to hold the Individual Defendants liable for their breaches of fiduciary duties.   The defendants' conduct, as alleged herein, constituted bad faith and disloyal conduct – conduct for which QSI is not permitted to indemnify the defendants under California law.   Because the Individual Defendants cannot be indemnified, they face a substantial likelihood of liability.   As a result, a majority of the current board of directors of QSI (the "Board") is interested in the outcome of this action and is not independent and disinterested; any demand on the Board is therefore futile and excused.

## II.     JURISDICTION AND VENUE

12.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a), as Plaintiff and Defendants are either citizens of different states or citizens of a state and citizens or subjects of a foreign state and the amount in controversy exceeds

$75,000 exclusive of interests and costs. This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

13.     This Court has jurisdiction over each defendant because each defendant is either a corporation that conducts business in, and maintains operations in, this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

14.     Venue is proper in this Court under 28 U.S.C. §139l(a) because: (1) one or more defendants either reside in, or maintain executive offices in, this District; (2) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, occurred within this District, and (3) defendants have received substantial compensation in this District by conducting business herein and by engaging in numerous activities that have had an effect in this District.

### III.   THE PARTIES

**Plaintiff Shareholder**

15.     Plaintiff is a current shareholder of Quality Systems and has been a shareholder of the Company continuously throughout the Relevant Period, including at all times since 2007. Plaintiff is a citizen of the state of Texas.

**Nominal Defendant Quality Systems**

16.     Quality Systems is a California corporation based in Irvine, California. The Company engages in the development and marketing of health care management systems, operating through four divisions (QSI Dental, NextGen, Hospital Solutions, and Revenue Cycle Management (RCM) Services).

**Individual Defendants**

17.     Defendant Craig A. Barbarosh ("Barbarosh") has been a director of the Company since 2009 and serves as Chair of the Board's nominating and governance committee as well as sits on the Board's compensation, transaction, executive personnel, and special committees. Barbarosh has served as the Company's Vice Chairman of the Board since November 2015. Mr. Barbarosh is a partner at the international law firm of Katten Muchin Rosenman LLP, a position he has held since June 2012. From January 1999 until June 2012, Mr. Barbarosh was a partner of the law firm of Pillsbury Winthrop Shaw Pittman LLP. Because of Defendant Barbarosh's experience and positions at Quality Systems, his access to internal corporate documents, conversations and connections with other corporate offices and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to him in connection therewith, he knew the non-public information about the business of Quality Systems. Plaintiff is informed and believes that Defendant Barbarosh is a citizen of the State of California.

18.     Defendant George H. Bristol ("Bristol") has been a director of the Company since 2008. Defendant Bristol is chair of the Board's audit committee as well as a member of its transaction, executive personnel and special committees. Because of Defendant Bristol's experience and positions at Quality Systems, his access to internal corporate documents, conversations and connections with other corporate offices and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to him in connection therewith, he knew the adverse non-public information about the business of Quality Systems, its finances, and present and future business prospects, as well as its lack of internal controls. Upon information and belief, defendant Bristol is a citizen of either the State of Rhode Island or Connecticut.

19.     Defendant James C. Malone ("Malone") has served as a director of the Company since 2013. Upon information and belief, Defendant Malone is a citizen of the State of Washington.

20.     Defendant Peter M. Neupert ("Neupert") has served on the Board since 2013. Upon information and belief, Defendant Neupert is a citizen of the State of Washington.

21.     Defendant Morris Panner ("Panner") has been a director of the Company since 2013. Upon information and belief, Defendant Panner is a citizen of the State of Massachusetts.

22.     Defendant D. Russell Pflueger ("Pflueger") served as a director of the Company from 2006 until August 2017. During such times, Defendant Pflueger was chair of the Company's compensation committee and a member of its executive personnel, audit and special committees. Because of Defendant Pflueger's experience and position at Quality Systems, his access to internal corporate documents, conversations and connections with other corporate offices and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to him in connection therewith, he knew the adverse non-public information about the business of Quality Systems, its finances, and present and future business prospects, as well as its lack of internal controls. Upon information and belief, Defendant Pflueger is a citizen of the State of California.

23.     Defendant Steven T. Plochocki ("Plochocki") was a director of the Company from 2004 until August 11, 2015, and served as its Chief Executive Officer from August 16, 2008 until June 30, 2015. He also served as the Company's President from January 25, 2012 until June 30, 2015. Because of Defendant Plochocki's experience and position at Quality Systems, his access to internal corporate documents, conversations and connections with other corporate offices and employees, attendance at management and Board meetings and

committees thereof and via reports and other information provided to him in connection therewith, he knew the adverse non-public information about the business of Quality Systems, its finances, and present and future business prospects, as well as its lack of internal controls. Defendant Plochocki participated in the issuance of improper statements, including the preparation of improper press releases and filings with the SEC. Upon information and belief, Defendant Plochocki is a citizen of the State of California.

24.    Defendant Sheldon Razin ("Razin") is the founder of Quality Systems and has served as its Chairman of the Board since 1974. Defendant Razin was formerly the Chief Executive Officer of the Company but his employment was terminated by the Company's Board in March 2000. Defendant Razin is the chair of the Company's transaction committee and sits on its special committee and executive personnel committee as well. Defendant Razin is the Company's largest shareholder, owning approximately 16.2% of the Company's stock. Because of Defendant Razin's experience and position at Quality Systems, his access to internal corporate documents, conversations and connections with other corporate offices and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to him in connection therewith, he knew the adverse non-public information about the business of Quality Systems, its finances, and present and future business prospects, as well as its lack of internal controls. Defendant Razin participated in the issuance of improper statements, including the preparation of improper press releases and filings with the SEC. Upon information and belief, Defendant Razin is a citizen of the State of California.

25.    Defendant Lance E. Rosenzweig ("Rosenzweig") has been a director of the Company since 2012. Defendant Rosenzweig serves on the Company's compensation, transaction, executive personnel and special committees. Upon

information and belief, Defendant Rosenzweig is a citizen of the State of California.

26.   Defendant Paul A. Holt ("Holt") was QSI's Chief Financial Officer during the Relevant Time Period and made or caused QSI to make false and misleading statements, as alleged herein.  Holt also participated in conference calls with securities analysts during which he made false and misleading statements about QSI and its financial results and guidance.  Holt resigned from QSI effective April 12, 2015.  He subsequently went to work for Nanthealth, which went public a little over a year after Holt joined the Company at a price of $14.  Nanthealth's stock price precipitously declined thereafter, trading as low as $3.39 a mere one year after the IPO.  Holt has been sued for securities fraud by investors in Nanthealth in a case pending in this District – *Deora v. Nanthealth, Patrick Soon-Shiong, Paul A. Holt, et al.*, Case No. 2:17-cv-01825 (C.D. Cal.).  Upon information and belief, Defendant Holt is a citizen of the State of California.

**IV.   FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

27.   By reason of their positions as officers and directors of QSI and because of  their ability to control the business and corporate affairs of the Company, the Individual Defendants owed QSI and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care.  These duties required the Individual Defendants to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner, and to act in the best interests of QSI and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

28.   Each director and officer of the Company owed and owes to QSI and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

29.     To discharge their duties, the officers and directors of QSI were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the Company.  By virtue of such duties, the officers and directors of QSI were required to, among other things:

(a)     ensure that proper internal controls existed at QSI, including internal controls for avoiding self-dealing, as well as controls to ensure accurate financial reporting, accounting, and management systems;

(b)     ensure that the filing of any audits, reports, or other public statements issued by QSI included full and accurate disclosures of all material facts;

(c)     manage, direct, and supervise the employees, businesses, and affairs of QSI in accordance with the laws of the United States, the laws of its state of incorporation, and all other states in which QSI conducts business;

(d)     manage, direct, and supervise the employees, businesses, and affairs of QSI in accordance with the rules and regulations set by government agencies and in accordance with the Company's certificate of incorporation and by-laws;

(e)     fully inform themselves as to QSI's operations and, upon receiving notice or information of potentially unsafe, imprudent, or unlawful practices, to make a reasonable investigation into those practices as well as to take all necessary corrective action;

(f)     supervise and assist in the preparation, creation, filing, and dissemination  of  all SEC filings, press releases, audits, financial statements, reports, and other information disseminated to the public by QSI;

(g)     conduct QSI's affairs in an efficient, businesslike matter so as to make it possible to provide the highest quality of performance of its business, to avoid wasting QSI's assets, and to maximize the value of QSI's stock;

(h)     exercise reasonable control and supervision over the officers and employees of the Company; and

(i)     preserve and enhance the reputation and goodwill of QSI in the public eye to ensure trust and confidence in QSI as a prudently-managed corporation.

30.     Each Individual Defendant, by virtue of his or her position as a director or officer, owed to the Company and its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants, as alleged in this complaint, involves knowing and/or reckless violations of their obligations as directors and officers of QSI, the absence of good faith on their part, and/or a reckless disregard for their duties to the Company and its shareholders.  The Individual Defendants were aware or should have been aware that the wrongful conduct described in this complaint posed a risk of serious injury to the Company.

31.     The conduct of the Individual Defendants who were also officers and/or directors of the Company has been ratified by the remaining Individual Defendants.

32.     At times relevant hereto, defendants were the agents of each of the other defendants and were at all times acting within the course and scope of such agency.

33.     Moreover, the Audit Committee's Charter[3] sets forth the following additional duties and responsibilities of the Audit Committee of the Board:

a.     Review and reassess the adequacy of this Charter annually and recommend any proposed changes to the Board of Directors for approval.

b.     Review and discuss with management and the independent

---

[3] As amended and approved by the Board on January 29, 2004.

auditor the annual audited financial statements, including disclosures made in management's discussion and analysis, and recommend to the Board of Directors whether the audited financial statements should be included in the Company's Form 10-K.

c.      Review and discuss with management and the independent auditor the Company's quarterly financial statements prior to the filing of its Form 10-Q, including the results of the independent auditor's review of the quarterly financial statements.

d.      Review and discuss reports from the independent auditors on:

(i) All critical accounting policies and practices to be used.

(ii) All alternative treatments of financial information within generally accepted accounting principles that have been discussed with management, ramifications of the use of such alternative disclosures and treatments, and the treatment preferred by the independent auditor.

(iii) Other material written communications between the independent auditor and management, such as any management letter or schedule of unadjusted differences. Discuss with the independent auditor the matters required to be discussed by Statement on Auditing Standards No. 61 relating to the conduct of the audit, including any difficulties encountered in the course of the audit work, any restrictions on the scope of activities or access to requested information, and any significant disagreements with management.

e.      Discuss with the independent auditor the matters required to be discussed by Statement on Auditing Standards No. 61 relating to the conduct of the audit, including any difficulties encountered in the course of the audit work, any restrictions on the scope of activities or

access to requested information, and any significant disagreements with management.

f.      Review disclosures made to the Audit Committee by the Company's CEO and CFO during their certification process for the Form 10-K and Form 10-Q about any significant deficiencies in the design or operation of internal controls or material weaknesses therein and any fraud involving management or other employees who have a significant role in the Company's internal controls.

## V.      BACKGROUND

34.     Quality Systems, Inc. is a California corporation headquartered in Irvine, California.

35.     QSI and its wholly owned subsidiaries operate in four business divisions: (i) the QSI Dental Division, (ii) the NextGen Division, (iii) the Hospital Solutions Division, and (iv) the RCM Services Division. The Company derives revenue primarily from developing and marketing healthcare information systems that automate certain aspects of medical and dental practices and in between 2000 and mid-2011 the Company experienced significant growth due primarily to the success of its NextGen business unit.

36.     The Company's NextGen business unit is the product of the Company's 1996 acquisition of Clinitec. Patrick Cline, the former interim Chief Executive Officer of Quality Systems and President of Quality Systems was a cofounder of Clinitec and after Clinitec was acquired in 1996 it was combined with another company to form the basis of the Quality Systems NextGen business unit. Under the leadership of Patrick Cline, the NextGen business unit flourished, becoming one of the leaders in the development and provision of electronic health records. Between 2000 and 2009 the NextGen business unit grew by 1300%. The unit ultimately accounted for approximately 95% of Quality Systems revenues and profits and this was reflected in the Company's stock price. However,

according to a complaint filed by one of QSI's former long-time directors, Mr. Hussein,[4] the NextGen unit began to falter when Mr. Cline resigned his position in 2011 after being frustrated with Razin's decision making and the steps he had taken to exert control over the NextGen business unit.

37.     Quality Systems' ability to generate future revenue was integral to the value of its stock. During the Relevant Period the Individual Defendants repeatedly caused the Company to misrepresent its growth prospects. In 2012, Defendant Plochocki emphasized that the Company's stock was a good investment because the Company had exceeded analysts' expectations for five consecutive quarters and analysts in turn recommended the Company stock due to its growth profile. But by May 2011, Mr. Cline's resignation combined with concern that Quality Systems had saturated its principal markets led the market to question whether the Company's historical growth rates could be maintained. For example, Oppenheimer stated investors had begun to question whether "peak multiples may be behind us."

38.     To reassure the market and maintain the price of the Company's stock price, the Individual Defendants engaged in a scheme of misrepresenting earnings and guidance projections.

## VI.    THE INDIVIDUAL DEFENDANTS' CAUSE THE COMPANY TO MAKE FALSE AND MISLEADING STATEMENTS DURING THE RELEVANT PERIOD

### A.    Defendants' False Statements from May 26, 2011 to December 14, 2011

39.     On May 26, 2011 QSI held an analyst conference call to report its quarterly results for the fiscal 2011 quarter. During the call, Defendant Plochocki stated that Quality Systems was "in agreement with the consensus view of

---

[4] *Ahmed D. Hussein v. Sheldon Razin et al.*, Case No. 30-2013- 00679600-CU-NP-CJC (Super. Ct. Orange Cnty.) (the "*Hussein* Action").

14

analysts in terms of their projections for revenues for fiscal year 2012." Similarly, on July 28, 2011 Defendant Plochocki again stated the Company was "in agreement with the consensus view of the analysts for revenue and earnings per share."

40.     Less than one month later, on June 9, 2011, Defendant Holt commented about the ambulatory market at a Goldman Sachs Global Healthcare Conference. In response to a direct and specific question about what proportion of the ambulatory business was made up of the highly profitable new business contracts ("greenfield") versus the less profitable replacement market (also referred to as "competitive displacements"), Holt said "it's greenfield for the most part . . . and I think it's going to be that way for a while."

41.     On July 28, 2011, QSI held an analyst conference call to report its FY2012 first quarter results. On the July 28, 2011 conference call, Plochocki raised the FY2012 EPS guidance of that previously issued on May 26, 2011, stating that QSI was in "agreement with the consensus view of the analysts for revenue and earnings per share." In response to a specific question about what precise "consensus view" QSI was in agreement with, Plochocki stated that it was the new and increased consensus view of EPS at $2.79 per share.

42.     The May 26, 2011, June 9, 2011, and July 28, 2011 statements were material to investors. In response to QSI's EPS guidance, numerous analysts recommended that investors buy QSI stock precisely because of the Company's purported growth prospects. For example, J.P. Morgan rated the stock "[o]verweight" and reported that "we feel the company is now on solid footing to benefit from accelerated growth," and "[w]e continue to like QSII's growth prospects." Similarly, Morgan Stanley rated QSI stock "[o]verweight" because the "[g]rowth [s]tory [r]emains [s]olid." In turn, the Company's stock price rose significantly. Between May 2011 and the end of September 2011, QSI's stock

price increased approximately 13%, reaching an all-time high of $50.04 on September 27, 2011.

43. Defendants' statements and omissions about the Company's projected revenue and EPS for FY2012 and OSI's prospects for further growth were materially false and misleading in at least the following respects:

(a) Numerous former QSI employees, including the Company's longtime Director and second largest shareholder, Hussein, confirm that by April 2011, QSI began experiencing a marked slowdown in new client bookings and "adds" to its sales pipeline. According to a verified complaint filed by Mr. Hussein, "[c]ontrary to the growth projections" that Defendants publicly issued to the market, "QSI's new bookings had, in fact, begun declining a year earlier, in the first quarter of fiscal 2012 [quarter beginning April 1, 2011], and QSI's sales pipeline had begun declining in the fourth quarter of fiscal 2012 [quarter beginning January 1, 2012]." As a result, according to Hussein, "QSI's financial performance had begun slowing down in late 2011." According to Hussein, the slowdown resulted in QSI "ma[king] projections that lacked any objective basis" and which were "totally inconsistent with QSI's actual business performance at and before the times the projections were disclosed."

(b) Former QSI employees that were employed by QSI during the Relevant Period have also confirmed that QSI was experiencing a slowdown in its business beginning in early 2011 if not earlier. According to these employees, by April 2012 new sales opportunities had dried up altogether, and the Company had stopped paying bonuses tied to corporate performance because QSI was not hitting any of its numbers.

(c) At the time the statements were made, real-time internal forecasting data and sales reports that were circulated and available to the

Individual Defendants and the Company's executives and management contradicted and were inconsistent with Defendants' public statements.

44.    On October 27, 2011, Quality Systems held an analyst conference call to discuss its results for the fiscal 2012 second quarter. During this conference Defendant Plochocki stated:

As a result of our strong first-half performance and our confidence in the second half of this year, we are now prepared to up our general views for the year. More in line with consensus views, we are now in general agreement with a revenue range of growth of 21 % to 24% for the year and a BPS range of growth of 29% to 33% for the year. This is an upgrade from our previous views of 20% to 23% revenue growth and . . . 28% to 32% BPS growth. Our confidence is strong, we're bullish on our second half[.]

45.    During the October 27, 2011 call, an analyst asked whether the Company's raised guidance was "conservative," and Plochocki stated that the guidance was "quite conservative" given that the Company's pipeline of future business was so "large:"

And so our confidence going into this quarter and our fiscal year fourth quarter is very strong. So it gave us the opportunity to take a second look at the ranges we had provided historically and gave us the confidence to up them slightly. And as you know, we're typically quite conservative.

46.    In response to a specific question about QSI's pipeline and whether it was flattening out, Scott Decker, President of QSI's NextGen business unit ("Decker") also emphasized that current demand was strong. "But I would say if you look out 12 – 12 months and further, *it's unprecedented with the amount of demand we see coming* for our clients for rollout levels to extents they've never talked to us about in the past, so it is flat but I wouldn't read too much into that."

17

47.    Plochocki was asked about whether the EHR market had topped out and whether most of QSI's business was no longer greenfield. Plochocki "set the record straight," and stated that "the greenfield opportunities are plentiful. As I said, more than half of the large practice market, more than 75% of the midsize practice market is still fair game for new system sales."

48.    Analysts again reacted positively to these statements. For example, after the October 27, 2011 call, Deutsche Bank emphasized that QSI was reporting "strong growth" and that management "remains optimistic on the state of end market demand and its ability to continue to drive significant growth." Similarly, William Blair reiterated its "outperform" rating on QSI stock, and urged that QSI "shares have the potential to benefit from strong earnings growth."

49.    On November 7, 2011, *Investor's Business Daily* published an interview with Defendant Plochocki. The article was titled "Quality Systems Chief Says the Company's Business Boom Just Getting Started." During the interview, Defendant Plochocki was questioned about the market's concern that the Company's business may be slowing. He emphatically denied this in the article which stated "Plochocki said worries about flattening and saturation were baseless. '*There is nothing drying up and there is nothing slowing down*,' he said."

50.    On December 14, 2011, Defendant Plochocki participated in the Oppenheimer & Co. Inc. Healthcare Conference. During the conference, Plochocki again denied that QSI's business was slowing. To the contrary, according to Plochocki, "greenfield opportunities" "are going to continue to grow." Plochocki also emphasized the strength of the Company's current pipeline: "So the bottom line is that our pipeline current and our pipeline future are very robust."

51.    Responding to analyst commentary that the large-practice market and mid-size practice market may be totally penetrated, Plochocki was adamant

that this was not the case. "And lot of people will say, well, the market – the first groups that will be totally penetrated will be large and mid-practices. You wouldn't know that by our pipeline and you certainly wouldn't know that by our categories three and four in our pipeline."

52.    Defendants' statements and omissions in the October 27, 2011 call, November 7, 2011 interview, and December 14, 2011 conference calls concerning QSI's earnings projections, demand for its products, and present and future sales conditions were false and misleading in at least the following respects:

(a)    As set forth above, QSI's most profitable segment, and the most important driver of growth, new system sales, was in decline by April 2011 – and suffered further deterioration throughout 2011.

(b)    Defendants' projections lacked any objective basis, and in fact were inconsistent with QSI's actual business performance at and before the times the projections were disclosed.

(c)    At the time the statements were made, real-time internal forecasting data and sales reports that were circulated and available to the Individual Defendants and the Company's executives and management contradicted and were inconsistent with Defendants' public statements.

### B.    January 9, 2012 Healthcare Conference, January 26, 2012 Earnings Call, and February 7, 2012 Healthcare Conference

53.    On January 9, 2012, Defendant Plochocki attended a JPMorgan Global Health Care Conference. At this conference Defendant Plochocki once again affirmed the upwardly revised fiscal 2012 guidance stating:

We are earmarked for a very strong year. Our fiscal year ends March 31, and we have given analysts prognostications for ... earnings per share growth [in the] 29% to 34% range.

19

54.     Then, on January 26, 2012, the Company held an analyst call to discuss its results for the third fiscal quarter of 2012. On the call Defendant Plochocki stated:

> ***Our pipeline continues to build to record levels***. As leads, RFPs online demos, web hits continue to accelerate throughout all of our business units, we're setting a very strong foundation for what we believe is going to be a powerfully robust period here in the second year of the stimulus movement.

55.     During the January 26, 2012 call an analyst noted that the Company had "been providing us some higher-level guidance in terms of growth," to which Defendant Plochocki responded:

> I think the guidance that we provided last quarter was 21% to 24% revenue growth for the year. That's the year that will be ending in two months. And then our EPS, I think we upgraded to 29% to 34%. And actually, quite honestly, we probably have a pretty good shot at 35% on that bottom one. And then, of course, we'll be announcing guidance on our next call for our fiscal year 2013.

56.     Decker was asked about the pipeline and whether the current "margin profile" was shifting. Decker, admitting that he had actual access to current internal data, denied that the current pipeline margin profile was deteriorating:

> Brian Delaney – Interest Capital (Analyst): Hey, guys, thanks for taking the call. As it relates to the pipeline, can you guys just comment on the margin profile, what's been getting put in the pipeline, is it consistent with the type of margin profile that we have seen in the pipeline over the last few quarters in terms of what we have added?

Scott Decker – Quality Systems, Inc. – President-NextGen Healthcare Information Systems: Yeah, we haven't changed any of the model in our reporting pipeline, so it's very consistent, and there's nothing out of character in the pipeline that we're reporting today versus what we have seen there the past couple of years.

57.     At the end of the January 26, 2012 conference, Plochocki again underscored QSI's purported favorable growth prospects, as follows:

*I think what you see here is a company that's now five straight quarters where we have exceeded analysts expectations for revenue growth and earnings per share*. We have $183 million worth of pipeline, which is growing. We have categories three and four in your pipeline, which are building, as well, so I think along the lines of the CMS report that came out late October, excuse me, late November, we truly are embarking upon probably a four to eight quarter period of the most robust growth in EHR adoption, and we're well prepared for it with product and service offerings that we think will serve the shareholder quite well.

58.     Analyst again praised the Company's growth prospects. That same day, on January 26, 2012, William Blair issued a report highlighting that "management referr[ed] to the market outlook as 'powerfully robust' several times during the call," and recommended that investors buy QSI stock.

59.     Defendant Plochocki continued touting the Company's future growth prospects during UBS's February 7, 2012 Global Health Care Services Conference. At the conference Defendant Plochocki stated:

Our sales pipeline; we have $183 million worth of pipeline, the business we intend to close within the next six to eight months. That sales pipeline has grown every quarter since the announcement of the stimulus bill back in February of 2009 and we view it as continually

21

growing as a result of the fact that the leads that continue to come into our system, the RFPs, are building a strong base along those areas.

60.     Just two weeks before he cashed in, dumping 87% of his QSI holdings, Plochocki acknowledged the concern that the highly profitable new EHR business had peaked stating that: "one of the things that is continually asked is when is this going to peak? Where is the peaking out of this electronic medical record system going to take place?" Plochocki was adamant that there was no peak in sight. Plochocki concluded his comments by stating that the current EHR market "is truly a unique opportunity and we intend to cash in on it."

61.     Defendants' statements and omissions in the January 9, 2012 conference, January 26, 2012 call, and February 7, 2012 conference concerning QSI's "record" and "continually growing" sales pipeline, earnings projections for FY2013 and growth prospects were materially false and misleading in at least the following respects:

(a) QSI's most profitable segment, and the most important driver of growth, new system sales, was in decline by April 2011 – and suffered further deterioration throughout 2011.

(b) Defendants' projections lacked any objective basis, and in fact were inconsistent with QSI's actual business performance at and before the times the projections were disclosed.

(c) QSI's sales pipeline was in decline by the fourth quarter of FY2012 (the quarter beginning January 1, 2012), and QSI's financial performance had begun slowing down in late 2011.

(d) At the time the statements were made, real-time internal forecasting data and sales reports that were circulated and available to the Individual Defendants and the Company's executives and management contradicted and were inconsistent with Defendants' public statements.

C.    **May 9, 2012 Robert W. Baird & Co. Growth Stock Conference**

62.    On May 7, 2012, Defendant Plochocki participated in the Deutsche Bank Healthcare Conference. After delivering prepared comments regarding QSI's business, Plochocki answered questions from financial analysts. One analyst specifically asked Plochocki whether increased competition was affecting QSI's profitability. In response, Plochocki – admitting that he had actual access to up-to the- minute internal Company information regarding sales – disclosed that "[t]he deals are elongated." And, for the first time, Plochocki admitted that "[t]he deals are taking a little bit longer to get done. It's one of the trends that we're starting to see a little bit more of." On May 8, 2012, prior to the market's open, J.P. Morgan – after speaking with QSI's management "this morning" – published an analyst report. In its May 8, 2012 report, J.P. Morgan disclosed that during the May 8, 2012 discussion, QSI management delivered "downbeat" commentary. Based on this new information regarding "concerns around deal closure cycles getting elongated," J.P. Morgan cut its fiscal fourth quarter 2012 estimates for both revenue and EPS.

63.    To counteract the effect of the previous days' disclosures, on May 9, 2012, Decker delivered prepared remarks to investors at a Robert W. Baird & Co. Growth Stock Conference. Decker began his presentation by emphasizing that QSI remained "very bullish on the healthcare market." "And I'll just start in, *because of all the volatility, and say we really are very bullish on the healthcare market, where it's going, and how we're positioned in it*." Decker added that, "from the macro standpoint, we feel really good about the trends in the industry, where the industry's going, and how we're positioned to take advantage of that."

64.    In response to a question regarding Plochocki's May 7, 2012 disclosure that sales were taking longer to close, Decker admitted that he had actual access to real-time internal data regarding current sales information, and was emphatic that this was not the case:

1    Yeah, the question is some comments earlier this week at another

2    conference were made on the sales cycle and that it may be

3    lengthening. And you're on the right point, which is, is that a macro

4    trend we're seeing, and it absolutely is not a macro trend we're

5    seeing. In fact, I went back through the data over the last few days

6    and objectively looked at it. Sales cycle has not lengthened for us

7    across the board, and in fact, over the last year, you've seen a

8    compression of it. Where Steve [Plochocki] got – his comments were

9    reflecting on, as the CEO, he deals with some bigger deals, and as

10   always, there were some deals that took longer than expected to

11   close.

12         Why did they take longer to close? Well, there is a little bit

13   more uncertainty right now in the market than maybe there was a

14   quarter or two ago. It just goes in cycles, right? And so with the

15   Supreme Court stuff and everything going on, you kind of try to

16   vector maybe why did a couple deals extend out, that might have

17   contributed to it. But as I said, I can safely say to you, looking at the

18   objective data, there's nothing major trend-wise going on in our

19   installed base and our closed cycle. If anything, it's compressing,

20   and that's kind of what I would have expected, with meaningful use

21   having been an accelerator over the last year.

22   D.    **May 10, 2012 Press Release and Form 8-K**

23         65.   On May 10, 2012, QSI issued a press release, which was filed with

24   the SEC on Form 8-K that same day (the "May 10 Press Release and Form 8-K").

25   Defendant Holt signed the Form 8-K. In the press release, QSI preliminarily

26   announced its results for FY2012, including the fact that it expected to miss its

27   guidance by material amounts, as described above. Specifically, QSI disclosed

28   that it expected to report FY2012 EPS of between $1.27 and $1.30 – results

which translate to growth rates that were 28% below the bottom of QSI's guidance and 36% below the top of the guidance. QSI also disclosed that delays in closing deals were a cause of the declining sales.

66.    QSI also issued highly favorable guidance for FY2013. Specifically, the May 10 Press Release and Form 8-K stated: "Quality Systems management also announced annual revenue and earnings per share guidance for the upcoming 2013 fiscal year. . . . [E]arnings per share are expected to grow between 20 and 25 percent versus the 2012 fiscal year."

67.    And Plochocki emphasized that QSI's current business was strong and stated, "We are well positioned to help our clients address the necessary requirements for successfully participating in the future delivery of healthcare."

68.    Analysts were quick to react to Defendants' disclosure. For example, UBS published a report that day, titled "Where There's Smoke, There's Usually Fire," which noted that QSI's recent stock drops were caused by the disclosures "regarding deal closure times." In response to QSI's "pre-announced" "slower growth outlook" and "F4Q12 miss," UBS reduced its "price target" for QSI stock. "Importantly," according to UBS, "no commentary in today's release was made regarding the NextGen pipeline. . . . Pipeline growth has been slowing and we believe pipeline results/commentary will be critical to stock performance." That same day Cowen and Company issued a report that highlighted QSI's FY2013 guidance being "significantly below current consensus." In Cowen's view, QSI's challenge is that its "main customer target has been the mid-to-large physician group market, which we think is largely penetrated at this point." Likewise, Oppenheimer, commenting on QSI's May 10, 2012 disclosures, stated that "we believe the mid-to high-end of the physician market is saturated."

69.    That same day, Credit Suisse also decreased its "target price" for QSI. According to Credit Suisse, QSI's May 10, 2012 disclosures "raise concerns about the sustainability of elevated bookings growth." Commenting on QSI's

FY2013 guidance, Credit Suisse bluntly questioned whether Defendants were capable of being believed and asked, "Is it credible?" Moreover, Credit Suisse said it had "little conviction in the company's guidance." Similarly, JPM Securities reduced its estimates for QSI's FY2013 highlighting the fact that QSI "missed 4Q EPS expectations after communicating 4Q guidance fairly recently."

70.     Also on May 10, 2012, William Blair issued a report noting that QSI shares had declined "nearly 10%" following Plochocki's May 7, 2012 disclosures. In addition, William Blair analysts specifically questioned QSI's repeated claims regarding greenfield opportunities, noting that QSI "typically targets the largest physician groups," which "[a]s we have discussed several times in the past ... are the most penetrated accounts, and thus perhaps offer fewer greenfield opportunities than other segments (although management has consistently indicated the greenfield market is still plentiful)."

71.     On May 11, 2012, Caris & Company published an analyst report regarding QSI, lowering its price target in light of the May 10, 2012 disclosures. Caris & Company highlighted the importance of the NextGen sales pipeline and stated that it was "surprising[]" that QSI "did not disclose ... sales pipeline activity" in the May 10, 2012 disclosure. According to Caris & Company, the NextGen sales pipeline raises "questions over future system sales growth rate."

E.     **The May 14, 2012 JMP Securities Research Conference**

72.     On May 14, 2012, Holt participated in the JMP Securities Research Conference. During the May 14, 2012 conference, Holt reiterated the FY2013 guidance that the Company gave on May 10, 2012. In addition, Holt discussed how Defendants had arrived at the FY2013 guidance and stated, "I think that the guidance that we've put out in terms of revenue growth next year was something that we certainly spent a fair amount of time talking about internally before we would put that out. And we tried to be very thoughtful about it and I think it's certainly – we're confident I think in the guidance that we gave."

73.     On May 17, 2012, the Company held a conference call to discuss its fiscal year 2012 results. During the call Defendants affirmed the guidance set forth in the May 10 press release and Form 8-K. Defendants also made numerous fake statements designed to convince investors that QSI's poor FY 2012 results were a one-time event, and that the Company's growth prospects remained strong. Defendant Plochocki stated:

> Our performance for fiscal 2012 fourth quarter was impacted due to delays. In both the closing of several fourth quarter opportunities, as well as recognition of revenue related to a large customer implementation.
>
> Looking ahead, we remain confident about the growth opportunities, as evidenced by our recent guidance in the 2013 fiscal year. We have stated that we expect revenues to increase 20% to 24%, earnings per share to grow 20% to 25%.
>
> Some of the key dial-movers for our upcoming year include, one, to continue to expand offshore capabilities for software development and back office functions; two, expand our international distribution channel; three, continue to maximize cross-selling opportunities; four, sell more multiple product deals, like the Norton deal that we recently announced; five, expand RCM capabilities to dental and hospital markets; six, move upstream in the hospital sector; seven, be at the forefront of ACO modeling. At HIMSS in February, we introduced five new products to aid physicians in that effort.
>
> Eight, continue to compete and win in the 50% of the market that has yet to adopt electronic medical records. Nine, continue to acquire product and service offerings that supplement or complement our core offerings domestically and internationally.

27

74.    In responding to an analyst's question regarding the Company's ability to meet guidance, Defendant Plochocki responded that the Company was "very confident" that it would meet guidance. He further stated, "Our fundamentals haven't changed. Our pipeline keeps growing" and "we believe that we are going to be able to continue to grow at 20/20" and that:

> We have been historically a 20/20 or better company for at least the last 12 years. We are earmarking this year to be the same. We anticipate that the expansion in those nine areas I addressed twice already on this call, I think, are going to give us opportunities to continue to keep that pace.
>
> **We are very – we are very confident in that**.

75.    Similarly, Defendant Holt stated that the Company was confident in its ability to deliver on its guidance, in significant part because of the purportedly strong pipeline:

> Moving on to our fiscal 2013 guidance, our guidance range of 20% to 24% revenue growth includes expected growth in all of our business segments and revenue categories. We are expecting a slight increase in recurring revenue share of total revenue next year, primarily on the heels of faster growth in RCM and other recurring revenue streams. **We are confident in our ability to deliver on this guidance**, which is very consistent with our five-year compound annual growth rate of 23%.
>
> **Supporting our confidence in this guidance range are a number of factors, including our current sales pipeline**, growing momentum in RCM, which Monty will discuss further, increased interest we are seeing from payor groups and large enterprise customers in enterprise Ambulatory solutions, as rapid growth in demand for consulting and other services, additional products and

28

service capabilities as a result of acquisitions and new international market opportunities.

>   ***Our earnings per share guidance of 20% to 25% growth represents a slight increase compared to our five-year average compound annual growth rate of approximately 18%, and is consistent with what we've achieved on average over the last two years.***

Likewise, Decker emphasized that current demand in the critical high-margin ambulatory market was strong: "[w]e continue to see a robust Ambulatory market."

76.    In response to an analyst's question, Plochocki again attributed the poor fiscal 2012 results to delays in closing a few deals, and stated that the Company's business remained sound, its pipeline continued to be strong, and the Company's first quarter of FY2013 was off to a strong start:

>   [E]very four to six quarters, we have a quarter like this where the deals don't line up the way we would like them to, and we just don't get them done.

>   Several of the deals that we should have gotten done in the March-end quarter, we have since signed and have since announced to the marketplace.

>   It happens periodically. ***None of the fundamentals [of QSI's business] have changed, though. Our pipeline is deep***. Our categories one and two are strong. We have a very strong bevy of six- and seven-figure deals in that pipeline. None of the fundamentals gave us any indications that we weren't going to be able to pull some of these deals through. But the bottom line is that we did close many of them heading into this June quarter, and we are really off to a pretty good start for June.

77.   Similarly, later in the call, Plochocki stated:

The takeaway from this is that if the fundamentals have changed, that would be a different story. But our fundamentals haven't changed. Our pipeline keeps growing, categories one and two are very deep and vibrant for us this quarter. We haven't seen any fundamental change to any of the dynamics that have been feeding into our system for the last two to three years.

78.   In response to another analyst question as to whether the delay in closing deals during the FY2012 fourth quarter would "get worse" and negatively impact QSI's business in FY2013, Plochocki flatly denied that the Company anticipated any deterioration in its performance for FY2013, stating:

The several deals that took longer than we anticipated in our fourth quarter that have entered into closure cycles for our first quarter is one issue. Whether I am anticipating this to be an impact on our fiscal 2013, I would say no. It is two different issues.

Fiscal 2013, as we have it earmarked in our four divisions, with the nine points that we are going to drive, with the deals that we've closed, with the acquisitions we've already done, with our international distribution, channel distribution program now underway, we believe that we are going to be able to continue to grow at 20/20.

79.   Following the May 17, 2012 call, analysts reported that, while the fiscal 2012 results were disappointing, the Company's growth prospects remained strong, and continued to recommend that investors buy QSI stock. For example, on May 17, 2012 J.P. Morgan reported that QSI "[s]hares [p]rovide [c]ompelling [v]alue" because "management commentary on the call indicated the 4Q miss was part of the lumpy nature of the business rather than a fundamental change in the end market," and "[w]e continue to believe there is ample runway ahead [for

growth], and expect results over the next few quarters to prove this." Similarly, Sterne Agee issued a "buy" recommendation and reported that "[m]anagement's commentary on the earnings call gives us comfort that the factors responsible for a weaker than expected F4Q are transitory and do not signify a pause in the company's business momentum. We foresee QSII recovering into the mid-30s (up -20% from today) over the next several months as near-term concerns recede and investors regain confidence in the company's FY13 outlook."

80.    Defendants' statements on the May 17, 2012 call had their desired effect and financial analysts quickly reported that QSI's disappointing 2012 results were a one-time event and did not represent any decline in QSI's business. For example, UBS published a report on May 17, 2012 titled: "Apparently F4Q12 Was Just a Stubbed Toe." Similarly, Oppenheimer published a report on May 17, 2012, and noted that "the company spent the majority of the [May 17] conference call reassuring investors that demand remains strong."

81.    That same day, Sterne Agee issued a report and concluded that "[m]anagement's commentary on the earnings call gives us comfort that the factors responsible for a weaker than expected F4Q are transitory and do not signify a pause in the company's business momentum." Because of the contracts that QSI claimed had slipped from its FY2012 fourth quarter into its FY2013 first quarter, Sterne Agee "expect[ed] the June quarter to be sequentially stronger than the March quarter." Sterne Agee also emphasized the importance of the pipeline and that QSI reported stating that it "reinforc[es] the underlying strength of the business." In addition, Sterne Agee highlighted the FY2013 guidance for NextGen Ambulatory and stated that the "revenue growth forecast," was a reason it was maintaining a "[b]uy" recommendation. Sterne Agee also noted the importance of NextGen Ambulatory noting that it "accounts for 75% of consolidated revenues and 87% of operating income."

82.   Also on May 17, 2012, William Blair published a report about QSI and noted that the reported EPS was "down 20% year-over-year." The report also emphasized that, "[d]espite the . . . weaker-than-anticipated fiscal fourth-quarter results, management's commentary on the call was positive, with an emphasis on the fact that the fundamentals of the business have not changed." J.P. Morgan also issued a report regarding QSI on May 17, 2012 and, given Defendants' claims regarding expected growth, recommended that investors buy QSI stock.

83.   On May 18, 2012 following Defendants' bullish comments during the May 17, 2012 call, Credit Suisse maintained its "[n]eutral" rating of QSI. While Credit Suisse's "price target" for QSI remained unchanged, Credit Suisse questioned the "[c]redibility" of QSI's FY2013 guidance, stating that it remained "skeptical that weak 4Q results are merely a one-quarter issue." Caris & Company issued a report on May 18, 2012 that noted the recent "investor fear[s]" following Plochocki's comments that the "deal sales cycle had elongated," and concluded that "'[i]nvestors interpreted this as a sign that HCIT demand may have peaked." Caris & Company noted that during the May 17, 2012 call, Defendants "[r]efut[ed] this interpretation," and "provided data points that show rising HCIT demand." Similarly, Maxim Group and Auriga both published reports on May 18, 2012 and – given the repeated positive comments about QSI's current demand during the May 17, 2012 call – both reiterated a "buy" recommendation.

84.   Defendants' May 9-17, 2012 statements and omissions about the Company's "deep pipeline" of sales, projected revenue and EPS for FY2013, along with its prospects for driving further growth, were materially false and misleading in at least the following respects:

(a) QSI's most profitable segment, and the most important driver of growth, new system sales, was in decline by April 2011 – and suffered further deterioration throughout 2011.

(b) Defendants' projections lacked any objective basis, and in fact were totally inconsistent with QSI's actual business performance at and before the times the projections were disclosed.

(c) QSI's sales pipeline was in decline by the fourth quarter of FY2012 (the quarter beginning January 1, 2012), and QSI's financial performance had begun slowing down in late 2011.

(d) At the time the statements were made, real-time internal forecasting data and sales reports that were circulated and available to the Individual Defendants and the Company's executives and management contradicted and were inconsistent with Defendants' public statements.

## F.   **The June 26, 2012 Shareholder Letter and July 2012 Proxy Materials**

85.   As the first quarter of FY2013 progressed, Defendants repeatedly affirmed their bullish guidance calling for EPS growth of between 20% and 25%. In a series of statements during the spring and summer of 2012, QSI and Plochocki affirmed the favorable FY2013 guidance, and further stated that this guidance was a key reason why the Company was superior to its competitors. For example, at a June 4, 2012 analyst industry conference, Plochocki represented that the Company's strong guidance differentiated it from its competitors, stating that "we are the only company in our sector that has finished the year and given guidance on the upcoming year for revenue and earnings growth with a 2 in front of it in those two categories."

86.   On June 7, 2012, analysts at Sterne Agee reported on their "[c]all with [the] Quality Systems CEO." According to Sterne Agee, Plochocki told them that QSI was expecting "40% revenue growth in FY13." Sterne Agee commented that this forecast "might appear optimistic." But, based on Plochocki's claim that *"a majority of the business included in FY13 guidance represents commitments from existing customers*," Sterne Agee recommended a "[b]uy," and stated that

they had "little reason to believe QSII will miss current FY13 guidance." Similarly, on June 18, 2012, J.P. Morgan stated that it had met with QSI management on June 15, 2012 (just two weeks before the first quarter of FY2013 ended), and based on "feedback from management," J.P. Morgan concluded that "the EPS miss last quarter will be a blip on the radar – it's time to buy QSII shares." And, on June 22, 2012, UBS, looking back to QSI's claims regarding its FY2012 fourth quarter, stated that "F1Q13 should benefit from March quarter delays."

87. On June 26, 2012, just four days before the FY2013 first quarter closed, Defendants Razin, Plochocki, Barbarosh, Bristol, Pflueger, and Rosenzweig caused QSI to file proxy materials with the SEC on Schedule 14A. The proxy materials contained an open letter to the Company's shareholders signed by Defendants Razin, Plochocki, Barbarosh, Bristol, Pflueger and Rosenzweig (the "June 26, 2012 letter"). The proxy materials were motivated by a potential proxy contest that Mr. Hussein would be waging to nominate a slate of directors of his choosing. To persuade shareholders to maintain current management, the letter stated the following:

> We are proud of our strong record of delivering earnings growth and generating superior returns for our shareholders. We are also confident about our growth prospects. For fiscal 2013, we expect that revenues will increase in the 20-24% range and we expect earnings per share to grow by 20-25%.

88. QSI's FY2013 first quarter ended on June 30, 2012. As noted above, while Defendants had falsely assured investors that QSI would report EPS growth of between 20% and 25% for FY2013, in reality, QSI's EPS had declined by 19%. Nevertheless, *for weeks after the quarter ended*, Defendants continued to affirm the materially false and misleading FY2013 guidance. On July 9, 2012 and again on July 10, 2012, QSI filed preliminary proxy materials stating QSI had

"plans to grow revenues by 20-24% and earnings by 20-25% in FY2013." Furthermore, on July 13, 2012, Defendants filed QSI's Definitive Proxy Statement with the SEC on Schedule 14A, and on July 23, 2012, nearly a month after the quarter ended, Defendants filed Additional Definitive Proxy Materials with the SEC on Schedule 14A (collectively, the "July 2012 Proxy Materials"). The July 2012 Proxy Materials were signed by Defendants Plochocki and Razin. In the July 2012 Proxy Materials, Defendants stated: "For fiscal 2013 . . . we expect earnings per share to grow by 20-25%."

89.     Defendants' statements and omissions in the June 26, 2012 letter and July 2012 Proxy Materials concerning QSI's current and future sales and earnings forecasts for FY2013 were materially false and misleading in at least the following respects:

(a) QSI's most profitable segment, and the most important driver of growth, new system sales, was in decline by April 2011 – and suffered further deterioration throughout 2011.

(b) Defendants' projections lacked any objective basis, and in fact were totally inconsistent with QSI's actual business performance at and before the times the projections were disclosed.

(c) QSI's sales pipeline was in decline by the fourth quarter of FY2012 (the quarter beginning January 1, 2012), and QSI's financial performance had begun slowing down in late 2011.

(d) At the time the statements were made, real-time internal forecasting data and sales reports that were circulated and available to the Individual Defendants and the Company's executives and management contradicted and were inconsistent with Defendants' public statements.

90.     The proxy battle between Mr. Hussein and the Individual Defendants drew the attention of the SEC. On July 3, 2012, the SEC sent a letter to the Company scrutinizing its proxy materials and stating:

*Your proxy materials contain specific projections about the future performance of Quality Systems. For example, we note the following statement: "For fiscal 2013, we expect that revenues will increase in the 20-24% range and we expect earnings per share to grow by 20-25%.*

*Please provide support for these very specific projected figures by describing the assumptions underlying them, including any limitations on those assumptions or other factors that may cause them not to be realized. You may include such support in the proxy statement itself, or in revised additional proxy materials. Please revise and advise how you will make the necessary changes.*

91.     The July 3, 2012 letter further stated:

Support for any statements of fact, such as the earnings and revenue figures that appear in your proxy materials, must appear in the materials themselves or be provided supplementally to the staff. At a minimum, in your response letter, provide cites to the periodic reports or other filings in which such figures are reported.

92.     On July 9, 2012 Defendants Razin, Barbarosh, Bristol, Pflueger, Rosenzweig, and Holt caused QSI to file a revised preliminary proxy statement attempting to address the SEC's July 3, 2012 letter. The revised materials drew even further scrutiny from the agency. The SEC sent a letter to the Company on July 9, 2012 stating:

Refer to the new disclosure appearing at the top of page 10 of your revised proxy statement. Your criticisms of Mr. Hussein's nominees reference their lack of deep industry knowledge and experience with the Company.

36

However, we note that one of Mr. Hussein's nominees (Mr. Brennan) is a current director and another (Mr. Cline) served as President and Chief Strategy Office of the Company from 2009 until December 2011. With respect to Mr. Cline, explain why you do not believe he is well equipped to serve on the Board, given his prior position with the Company.

93.    The letter further stated:

Refer to comment 15 in our letter dated July 3, 2012 and your response. The revised disclosure on page 5 of the proxy statement added in response to our comment is confusing because the specific projections we cited in comment 15 do not appear there. Comment 15 asked you to provide support and describe the assumptions underlying the very specific projected figures cited in the comment and included in your prior proxy materials; *providing generic support and discussion without the projections themselves is confusing. Please revise or advise.*

94.    Despite the SEC scrutiny, the Company reaffirmed its 2013 fiscal year guidance in the Proxy Materials filed on July 13 and 23, 2012. On July 13, 2012, the Company filed its Definitive Proxy Statement with the SEC on Schedule 14A and on July 23, 2012 the Company filed Additional Definitive Proxy Materials. Both filings were signed by Defendants Razin and Plochocki and both maintained that in Fiscal 2013 the Company expected earnings per share to grow by 20-25%.

## VII.   THE COMPANY IS FORCED TO WITHDRAW ITS EARNINGS GUIDANCE

95.    On July 26, 2012, QSI issued a press release that shocked investors and revealed that contrary to Defendants' repeated claims – the last of which came just three days prior – the Company's business was in severe decline and

retracted its "reliable" and "conservative" guidance. Specifically, on July 26, 2012, QSI announced that its net income had declined 18% and its EPS had declined 19% as compared to the year-ago quarter. Due to these results, Plochocki stated that "we are not affirming our previous guidance nor providing revised guidance." Neither Plochocki nor any QSI representative provided any explanation as to how the Company could have reaffirmed its guidance as recently as three days ago, when they had known QSI's first quarter results for nearly a month. QSI also disclosed that its pipeline had declined significantly.

96.     During a conference call with analysts held on July 26, 2012 to discuss the Company's results, Defendant Plochocki announced that Quality Systems' net income for the first quarter of fiscal 2013 had declined by 18% from the prior year, and that its diluted earnings per share had declined 19% from the prior year. Defendant Plochocki said the results were attributable to "lower than expected revenue from large, higher margin software system sales." Defendant Plochocki also stated that the Company was retracting the earnings guidance that had been provided in May, June and July 2012, and reaffirmed less than two weeks earlier on July 13, 2012. He stated Quality Systems was "not affirming our previous guidance nor providing revised guidance at this time." This retraction, without any explanation of any change in the Company's prospects that could account for the deviation from the earnings guidance that the company had re-affirmed as recently as just thirteen days earlier, destroyed the credibility of the Company and the value of its shares in the marketplace, causing a 36.3% price drop in one day and causing the Company to trade at a substantial discount to the price to earnings ratios at which its key competitors were trading.

97.     During the conference call, Defendant Holt admitted the Company's gross profit margin was materially declining (down to 59.1% "from 65.2% a year ago"). Holt also admitted that the decline in QSI's gross margin was "primarily due to comparatively lower amount of high margin software revenue and the

change in revenue mix towards a larger portion of lower margin implementation and other service revenue." During the same call, Decker admitted that the steep decline in high margin software sales was *not* a new development: "[W]e continue to experience softness in system software sales that began last quarter." Decker went on to disclose that NextGen's market "is quite choppy right now," and "[t]here is definitely a pause in activity." Decker also admitted that the pipeline had dropped materially ("$153 million, versus $168 million a year ago").

98.     During the same July 26, 2012 call, which was just three days after QSI had affirmed guidance, and nearly a month after the close of the quarter, numerous financial analysts directly asked the obvious question: why retract rather than lower guidance? For example, Sean Wieland, an analyst with Piper Jaffray asked:

> So I guess my question is, pulling guidance conveys a level of uncertainty that certainly the market is uncomfortable with. You touched on it a little bit, but I just want to come back to it again? Why pull guidance as opposed to just lowering it given maybe even a worst case set of circumstances out there?

On the call, Defendants again admitted that they get up-to-the minute updates on sales – with Decker even stating during the call that he "just [got] a note" that QSI had just signed a large customer "this morning" – but, could not explain the discrepancy between their very recent affirming of guidance and the July 26, 2012 repeal.

99.     Like QSI's investors, analysts covering the Company were surprised by the disclosure of QSI's true financial condition. On July 26, 2012, in response to QSI's disclosure, financial analysts from Piper Jaffray put it bluntly: "The Fat Lady Sings." Piper Jaffray went on to question management's "various" explanations for the "poor quarter results," and stated that they believed the cause was "the saturated high-medium end physician market." That same day, Leerink

Swann analysts noted with astonishment that FY2013 guidance was "[a]bandoned with [n]o [v]isibility [p]rovided." Leerink Swann added that the miss should not have come as a surprise to Defendants: "We believe the miss this quarter is due to the large practice market being nearly fully penetrated, and we do not expect a large re-acceleration of sales in the back half of the year." In a second report published on July 26, 2012, after the QSI conference call, Leerink Swann even questioned Defendants' honesty in their statements regarding the loss of a large customer (HMA): "We are not convinced that management's commentary around HMA is valid."

100.   Similarly, analysts at Cowen and Company disputed Defendants' claim of a "pause" in new business and stated that they believed that "the market for EHRs, notably at the larger-end, is already peaking." Cowen and Company also noted that they were "surprised by these results," given that QSI had claimed "during its last quarterly call that a few deals that slipped in F4Q12 [had] been recognized in F1Q13." Likewise, analysts at Jefferies highlighted Defendants' "slippage" claim and noted that "[t]his is the second consecutive quarter management has attributed the poor revenue performance to slippage." And Jefferies raised concern that the "Recall on FY13 Guidance" came just "[o]ne quarter after issuing." Also on July 26, 2012, William Blair noted that the revelation regarding QSI's true financial condition was "surprising – as the company commented it was off to a solid start in the first fiscal quarter (after reporting disappointing fourth-quarter results, where several deals slipped into the first quarter). We believed the deal slippage would benefit fiscal first quarter results . . . ."

101.   Like many other analysts, on July 26, 2012, J.P. Morgan seized on the inconsistency between Defendants' recent claims that its first quarter FY2013 was off to a solid start and the revelation that "the company is withdrawing prior FY13 guidance." J.P. Morgan immediately downgraded the stock.

102. Also on July 26, 2012, financial analysts at Oppenheimer were critical of the fact that Defendants "did not specify what industry changes caused the removal of guidance." In a report published the following day, Oppenheimer suggested that Defendants were aware of the fact that the market was deteriorating: "We have been expecting a decline in ambulatory sales for some time." That same day, July 27, 2012, analysts from Wells Fargo Securities were even more pointed in questioning Defendants' prior guidance and stated that "[t]he large physician practice market that QSII primarily targets may have peaked around the second half of calendar 2011."

103. Following the July 26, 2012 disclosures by QSI, Hussein – then a current QSI director – confronted Plochocki and Holt and asked them how QSI could issue FY2013 projections only to retract them days later. Plochocki told Hussein that the projections were based on Razin's demands. In other words, Plochocki admitted that the projections were not based on QSI's actual business performance. Holt told Hussein that he did not remember signing off on the FY2013 projections.

104. The retraction of Quality Systems' previously issued earnings guidance, without any explanation or the identification of any change in the company's sales or financial performance during the thirteen-day period since it had last re-affirmed its fiscal 2013 earnings guidance, came as a total shock to the market. On July 26, 2012, QSI's stock price immediately plunged from $23.63 per share to $15.04 per share.

105. As a result of the Individual Defendants' actions, Quality Systems was sued by its second largest shareholder, Ahmed Hussein, in Orange County Superior Court on October 4, 2013. Mr. Hussein's complaint was the first publicly-filed document that alleged breaches of fiduciary duty by Defendants Razin and Plochocki.

106.   Then, on November 19, 2013, a shareholder class action lawsuit was filed in this Court on behalf of persons who bought the Company's stock from May 26, 2011 through July 25, 2012.   The securities class action complaint heavily relied upon allegations first disclosed in Mr. Hussein's complaint in order to provide the particularity necessary to allege that the defendants had violated the securities laws.

## VIII.  DEFENDANTS' KNOWLEDGE CONCERNING THE FALSITY OF THE STATEMENTS

107.   The facts alleged herein establish that Defendants' false and misleading statements and omissions were made intentionally and/or with reckless disregard for the truth. At all times, the Individual Defendants were well aware of or recklessly disregarded the slowdown in QSI's business.

108.   Defendants were also privy to real-time data reflecting the true revenues and earnings of every QSI operating division. Defendants knew that their public statements and projections were inconsistent with QSI's actual business performance because Defendants were provided with and could readily access continuously updated, comprehensive information regarding QSI's revenue, sales pipeline, internal forecasts and other performance metrics. Indeed, Defendants repeatedly assured investors that QSI's guidance was reliable because it was continuously updated and based on real-time internal data. QSI stated that it engaged in "a continuous reforecasting process, which incorporates inputs from all operating entities to determine short term and long term expectations." Moreover, QSI represented on analyst calls that it maintained and reviewed data on sales and other information concerning its business operations. For example, on May 9, 2012, Decker, NextGen's President, assured investors that QSI had real-time internal data regarding current sales status, that Decker had "gone back through the data over the last few days and objectively looked at it," and had concluded the "[s]ales cycle has not lengthened."

109.   Mr. Hussein, a QSI director for approximately 14 years, confirmed that QSI maintains real-time, continuously updated data that must have been known to Defendants. Hussein routinely attended meetings of the QSI Board and personally interacted with Plochocki, Holt and Razin and other top QSI executives regarding non-public matters, including QSI's actual and projected financial performance. According to Hussein, QSI engaged in a "'continuous reforecasting process' based on real-time information concerning QSI revenues and income," "business performance, financial performance [and] sales pipeline."

110.   The Individual Defendants also repeatedly admitted throughout the Relevant Period that they had actual access to real-time internal data regarding sales. For example, during the May 26, 2011 call, Plochocki explained: "All of our leads and the progress that we are making and the status and the forecasts are maintained within salesforce.com and it's a pretty objective set of criteria that we use to report the pipeline." Accordingly, during the Relevant Period, the Individual Defendants knew that QSI's guidance calling for significant growth was inconsistent with the true state of QSI's sales and business conditions, which were slowing down in FY2012 and, for FY2013, a sharp contrast.

111.   Additionally, various former QSI employees who worked at QSI during the Relevant Period confirmed the Company maintained and regularly updated real-time pipeline and forecasting information.  At least seven different former employees of QSI have been quoted as stating that the Company's executives had knowledge of the falsity of the statements alleged herein.  *See In re Quality Systems, Inc. Sec. Litig.*, Case No. 8:13-cv-01818-CJC-JPR, Docket No. 26 (Amended Complaint).

A.   **Defendant Plochocki Sold 87% of His QSI Stock While in Possession of Material Non-Public Information**

112.   Defendant Plochocki profited enormously from the scheme to misrepresent the truth about QSI's business. While in possession of material,

nonpublic information regarding the pronounced slowdown in QSI's business, Plochocki sold substantial amounts of QSI common stock at inflated prices. The price at which Defendant Plochocki sold his stock far exceeded the closing price of QSI stock after the Company announced that its EPS had significantly declined (*i.e.*, $15.95 on July 26, 2012).

113.   On February 24, 2012, Defendant Plochocki sold 88,500 QSI shares at $43.99 per share, reaping proceeds of $3,893,115, over seven times his fiscal 2012 salary. This stock sale was suspicious in timing and amount because: (i) Defendant Plochocki made this sale when he was aware that he was misrepresenting QSI's growth prospects (he cashed-out just weeks before QSI closed the FY2012 fourth quarter); (ii) prior to making this massive stock sale, he had made no stock sales for approximately three and a half years (since September 2008); (iii) through this sale, he liquidated nearly all, *i.e.*, 87%, of his holdings of QSI stock; and (iv) he made this sale at a time when QSI's stock price was near its all-time high.

114.   The suspiciousness of Plochocki's stock sales and their proximity to the timing of the market learning of the Company's true financial condition raises a strong inference that he knew about the Company's true financial condition when he liquidated his shares and used that information in connection with the sales. The QSI stock chart below illustrates the price of QSI stock when Defendant Plochocki dumped his QSI holdings compared to the price when the Company's true financial condition was disclosed.

///

///

///

///

///

///

44

1
2
3
4
5
6
7
8
9
10
11
12
13
14



15

16    115.   Not coincidentally, just two weeks before cashing in, Plochocki

17 urged investors to buy QSI stock and hyped the Company's stock price
performance stating that, QSI's "share price and market cap . . . have both tripled
18 in the last three and a half years."

19    116.   Defendant Plochocki's significant insider stock sales while in

20 possession of material non-public information regarding QSI's true financial

21 performance and growth prospects further support a strong inference of his

22 scienter.

23    B.   **The SEC Challenged the Adequacy of Defendants'**

24        **Disclosures Regarding QSI's Projections Calling Them**
        **"Generic" and "Confusing"**
25

26    117.   Defendants knew that QSI's FY2013 revenue and earnings

27 projections issued during the Relevant Period were materially false and

28 misleading. As detailed below, when the SEC asked QSI (in comment letters

dated July 3 and July 9, 2012) to provide investors with the support and assumptions underlying QSI's projections, Defendants instead included in QSI's proxy materials "generic support and discussion," which the SEC explained was "confusing" to shareholders. Defendants' provision of "generic" and "confusing" support for QSI's projections despite the warnings in the SEC's comment letters further demonstrates Defendants knew and recklessly disregarded the projections were materially false and misleading and without factual basis.

118. On June 25, 2012, QSI filed a preliminary proxy statement that stated QSI would "grow revenues by 20-24% and earnings by 20-25% in fiscal 2013." On June 26, 2012, QSI filed an "Open Letter" to QSI's shareholders, signed by Razin and Plochocki, stating that Defendants were "confident about [QSI's] growth prospects," and "[f]or fiscal 2013, we expect that revenues will increase in the 20-24% range and we expect earnings per share to grow by 20-25%." In making these statements, QSI omitted any support for these projections (which they knew were without factual basis) and any description of the assumptions underlying the projections. Further, QSI failed to list the limitations or other factors that could cause QSI to fail to realize the assumptions underlying the projections.

119. In a July 3, 2012 letter to QSI, the SEC flagged QSI's FY2013 projections and warned that QSI should "provide support for these very specific projected figures by describing the assumptions underlying them, including any limitations on those assumptions or other factors that may cause them not to be realized." The July 3 SEC letter reminded QSI that "the company and its management are in possession of all facts relating to [the] company's disclosure, [and] they are responsible for the accuracy and adequacy of the disclosures they have made."

120. Knowing the projections were without factual basis, and rather than excise the projections from QSI's proxy materials altogether, on July 9, 2012, the

Individual Defendants caused QSI to file revised proxy materials that repeated the statement that QSI would "grow revenues by 20-24% and earnings by 20-25% in fiscal 2013," and several pages later, represented that QSI "has an annual planning and budgeting process and a continuous reforecasting process, which incorporates inputs from all operating entities to determine short term and long term expectations," and provided a laundry-list of "input variables" purportedly considered in forming QSI's projections.

121.   On July 9, 2012, following its review of QSI's July 9, 2012 proxy materials, the SEC issued another letter to QSI regarding its misleading statements. The SEC's July 9, 2012 letter referred QSI to the concerns the SEC had expressed in its previous letter dated July 3, 2012, and explained that the SEC had "asked [QSI] to provide support and describe the assumptions underlying the very specific projected figures . . . included in [QSI's] proxy," that the revised materials provided only "generic support and discussion" for the projections, and that the "revised disclosure" in QSI's July 9, 2012 proxy materials was "confusing."

122.   On July 10, 2012, QSI filed another proxy statement that repeated QSI's revenue and earnings projections and the "generic support" it had previously include in its July 9, 2012 materials. QSI repeated its projections and "generic support" in further proxy materials filed on July 13 and July 23, 2012. On July 26, 2012, QSI retracted its revenue and earnings projections. Defendants' actions in refusing to provide any meaningful support for QSI's projections, which Defendants knew were without factual basis, further demonstrates a strong inference of scienter.

C.   **Defendants' False Statements and Omissions Concerned QSI's Core Operations Which Defendants Closely Monitored**

123.   Each of the Individual Defendants was a top executive and/or

director of QSI involved in QSI's daily operations and with access to all material information regarding the Company's core operations. Therefore, each of the Individual Defendants is presumed to have had knowledge of all material facts regarding QSI's core operations.

124.   Each of the false statements alleged herein involved a core operation of QSI. Defendants repeatedly hyped QSI's historical and projected revenue and EPS growth. Indeed, Defendants made statements about QSI's historical and projected revenue and EPS growth during each conference call during the Relevant Period.

125.   In addition, in the Company's SEC filings, it repeatedly assured investors that its guidance was highly reliable because the Company continually updated it based on real-time data from all its operating divisions, stating that QSI engaged in "a continuous reforecasting process, which incorporates inputs from all operating entities to determine short term and long term expectations." According to former independent director Hussein, and other former employees, QSI's guidance was continuously updated based on real-time data.

126.   Furthermore, according to Hussein, Razin was intimately involved in the day-to-day operations of QSI. Plochocki even told Hussein that it was Razin who came up with the FY2013 guidance.

D.   **Defendants Affirm QSI's FY2013 Guidance but Withdraw It Just Three Days Later**

127.   The temporal proximity of a misleading statement and a subsequent disclosure bolsters the inference that Defendants knew the statement was false when made. QSI's FY2013 first quarter closed on June 30, 2012, and the Company's results were dismal. Far from achieving at least 20% growth in earnings, the exact opposite had occurred: QSI's net income and EPS had declined by almost 20%. Significantly, while in possession of this material non-public information, QSI continued to falsely affirm its FY2013 guidance for

weeks after the first quarter closed in proxy materials dated July 9, 10, 13 and 23, 2012.

128.   On July 26, 2012 – *just three days after QSI affirmed its guidance* – QSI suddenly announced that its EPS had precipitously declined and, as a result, it was retracting its guidance. QSI disclosed that, compared to the year-ago quarter, its net income had declined 18% and its EPS had declined 19%, and thus, it was "not affirming [its] previous guidance nor providing revised guidance."

E.   **Defendant Razin's Control Over QSI's Operations and Board**

129.   Defendants also misled the market in order to help maintain Razin's control over the Company. According to Hussein, Razin and QSI's management "sought to perpetuate the market perception that the company was positioned to continue to grow and thrive, when in fact the opposite was happening." QSI's management misled investors in order to "reassure the market and QSI's shareholders regarding the financial condition and prospects for the company following Cline's departure and the company's announcement in May 2012 of disappointing earnings numbers for the fourth quarter of 2012."

130.   On June 15, 2012, Hussein informed QSI's Board that he was nominating a rival slate of directors for the Company's Board, and would be sponsoring a proxy contest in support of the election of those directors at the August 2012 annual shareholder meeting. "By reassuring the market regarding QSI's financial condition and growth prospects," Hussein explained, "Razin and QSI management sought to increase the prospects for the re-election of the incumbent directors and thereby to further consolidate Razin's control over the company," while "dissuad[ing] QSI investors from supporting [Hussein's] proposed slate of directors."

131.   Defendants Plochocki and Holt were well aware of Razin's significant influence over the Board and the Company's operations at the time

they participated in the scheme to mislead the market. Hussein described Razin as the "de facto CEO of the company," and stated that "[w]ithout board authorization, Razin maintains an office at QSI, controls and directs the use of QSI facilities and resources, and manages the company on a day-to-day basis." According to Hussein, "[a]ll significant decisions regarding the direction of the company are made by Razin, and the company's executive officers do not make public statements regarding the company, its operations, or its financial performance or future prospects without Razin's approval." Hussein also explained that "Razin's management team made the false statements in May, June and July 2012 regarding QSI's fiscal 2013 earnings projections *after consulting with Razin and obtaining his approval*, as they did on all important matters pertaining to the management of QSI."

132.   Plochocki and Holt also knew Razin carried great influence over the firing of QSI management. For example, according to Hussein, on May 26, 2010, Razin caused the creation of a Board committee entitled "Independent Directors Compensation and Executive Personnel Committee," which met only once (on May 26, 2010) and "was created for the sole purpose of facilitating Razin's decision to terminate [COO Philip] Kaplan's employment, for reasons that were never explained to Hussein, [director] Brennan, or the full board of directors."

133.   On another occasion, in May 2010, independent QSI director Joseph Davis "alerted the QSI board of directors that Razin had, for the past seven years, falsely certified that he was a full-time employee of the company in order to obtain health insurance coverage for himself and his wife under the company's benefit plan." According to Hussein, "Davis introduced a resolution seeking an independent investigation of Razin . . . which . . . was voted down by Razin and the directors aligned with him." According to Hussein, Razin successfully struck any mention of the resolution from the meeting minutes (despite the resolution having been listed on the agenda and having been supported by three of the seven

1  independent directors) and Davis was subsequently not nominated for re-election
2  to the Board.

3       134.   In furtherance of Defendants' attempt to deceive investors regarding
4  the Company's instability, Defendants withheld material information from the
5  market regarding the departures of Decker and Cline from QSI. According to
6  Hussein, in early August 2012 NextGen President Decker "informed Razin and
7  QSI management" before the "contested board election" had taken place, of his
8  resignation. According to Hussein, Decker had "object[ed] to Razin claiming the
9  status of an independent director while maintaining an office in the company and
10 functioning as its CEO." However, rather than announce Decker's resignation
11 prior to the August 16, 2012 shareholder meeting, Hussein stated that Defendants
12 Razin and Plochocki instead engaged in "subterfuge" in that they "did not inform
13 the full QSI board of [Decker's resignation] and delayed announcing Decker's
14 resignation until after the contested board election at the annual shareholders
15 meeting held" on August 16, 2012.

16      135.   On January 17, 2013, QSI announced Cline had "notified the
17 Chairman of the Board of his immediate resignation from the Board." However,
18 in announcing Cline's resignation from the Board of Directors, QSI did not
19 disclose the actual resignation letter, the fact that the letter had been addressed to
20 the entire Board (not just the Chairman), and the fact that Cline stated in the letter
21 he was leaving because of "the current board environment and company issues."
22 It was not until May 17, 2013 that QSI disclosed in a Form 8-K the contents of
23 Cline's resignation letter. QSI's Executive Vice President and General Counsel,
24 James Sullivan (who had signed the May 17, 2013 Form 8-K referenced above),
25 resigned shortly thereafter in May 2013. According to Hussein, "QSI made no
26 disclosure of the fact of Sullivan's resignation or the reasons for his resignation."
27 ///
28 ///

## IX.   THE DEFENDANTS BREACHED THEIR DUTIES OF LOYALTY AND GOOD FAITH BY FAILING TO ADOPT AND IMPLEMENT EFFECTIVE INTERNAL CONTROLS AT QSI

136.   The Individual Defendants also breached their fiduciary duties by failing to adopt and implement effective internal controls over financial reporting at QSI.

137.   Defendant Razin held the Chief Executive Officer position at QSI until March 2000 when, according to former director Hussein, he contravened provisions of a prior Memorandum of Understanding he had entered into by seeking to sell the Company without giving prior notice to or getting approval from the Company's then existing board of directors. The Board issued a written reprimand of Defendant Razin and his position was filled by Mr. Cline. However, due to his large share ownership and his domination and control of the Board, Defendant Razin remained on the Board. According to Mr. Hussein, after his removal as CEO, Defendant Razin began taking steps to reassert his control over the Board and establish himself as the Company's *de facto* CEO.

138.   As noted *supra*, Mr. Hussein filed the *Hussein* Action against Defendants Razin and Plochocki. Mr. Hussein's verified complaint detailed the Defendants' intentional overriding of the Company's internal controls, Defendants' self-dealing, and Defendant Razin's control over the Company (*i.e.* how the Board is beholden to Defendant Razin). As a former director of the Company, Mr. Hussein is uniquely positioned to provide factual detail. For example, Defendant Hussein's complaint reveals that after the Company retracted the guidance issued in the Proxy Materials, during its August 16, 2012 meeting, the Board refused to investigate the discrepancy between the Company's prior projections and its retracted guidance on July 26, 2013. *See* Complaint in *Hussein* Action ¶ 71. The complaint further states that when Mr. Hussein confronted Defendant Plochocki about the issue, Defendant Plochocki replied "he had authorized the prior projections because they were 'even less than what Shelly

[Razin] wants.'" *Id*. at ¶ 73. The problems at the Company are so pervasive that according to Mr. Hussein, the Company's former President and a member of the board of directors, Patrick Cline resigned from the Company's Board stating that "[a]fter careful consideration I have decided that given the current board environment and company issues, I am unable to help the company." *Id*. at ¶ 75. Notably, in disclosing Mr. Cline's resignation, Defendants failed to state the reason for his resignation or disclose his resignation letter.

139.  As detailed in Mr. Hussein's complaint, in 2004 Defendant Razin orchestrated the appointment of a new slate of directors beholden to him. *Id* at ¶ 37. Two of the four members of the Company's nominating committee formed a subcommittee and nominated directors supported by Defendant Razin. *Id*. This was done without the approval of the full board or a majority of the independent directors or the full nominating committee. *Id*. Once Defendant Razin's new slate of directors was appointed they proceeded to adopt amendments to the Company's by-laws to reclassify Defendant Razin as an "independent director" despite the fact that he is the Company's largest shareholder. *Id*. at ¶ 38. This allowed Defendant Razin to participate in the corporate decision-making functions that were to be controlled by the Company's independent directors.

140.  Defendant Razin also had his new slate of directors increase the size of the Board to include two members of the Company's management team which further consolidated Defendant Razin's control by ensuring a majority of the Board would consist of interested directors he had selected. *Id*. at ¶ 39. Defendant Razin then embarked on a series of actions to further consolidate his power over the Company. Mr. Hussein's complaint summarizes these actions and states, in relevant part that Defendant Razin's actions included, among other things:

> ● Restructuring the composition of Board committees to increase Razin's power and influence over the company by ensuring that all committees would be chaired by the directors most closely aligned

with Razin and that there would be no ability for Hussein or his nominees to influence corporate decision making;

- Circumventing a decision, approved by a 6-1 vote at a special Board meeting held in June 2004, to replace the corporate counsel chosen by Razin with a new independent counsel and to retain the new counsel to investigate inaccuracies in Board minutes and legal recommendations prepared by the prior counsel by causing QSI management to fail to fund the retainer for the independent counsel;

- Changing corporate by-laws to place decision-making power in so called "independent directors' committees" controlled by Razin that were independent in name only, while excluding Hussein from participation in those committees;

- Substantially increasing the compensation packages for QSI executives under which the executives would receive significantly higher compensation than they had previously even if the Company's business performance deteriorated;

- Substantially increasing the compensation packages for QSI directors to levels far in excess of the amounts QSI directors had previously made, and more than ten times in excess of the compensation that the directors were to have received when they joined the Board; and

- In early August 2012, NextGen president Scott Decker, one of the key executives along with Cline in the NextGen business that had been responsible for the growth of QSI, informed Razin and QSI management and his subordinates that he was resigning from the company because of objections to Razin claiming the status of an independent director while maintaining an office in the Company and functioning as its CEO. Razin and Plochocki did not inform the

full QSI Board of this fact and delayed announcing Decker's resignation until after the contested board election at the annual shareholders meeting held in mid-August 2012. Razin and Plochocki engaged in this subterfuge in order to ensure the election of Razin's slate of directors, thereby depriving Hussein and the Company's shareholders of the right to a fair and informed election.

*Id*. at ¶ 40.

141.  According to Mr. Hussein's complaint, Defendant Razin acts as the company's "de facto" CEO.  He maintains an office at Quality Systems, controls and directs the uses of the Company's facilities and resources, and manages the Company on a day-to-day basis. *Id* at ¶ 60.

142.  Defendant Razin has readily abused his power at the Company in order to engage in self-dealing based on false premises and on unreasonable terms. For example, in May 2010, Joseph Davis, an independent director of the Company alerted the Company's Board that Defendant Razin had, for the prior seven years, falsely certified that he was a full-time employee of the Company in order to obtain health insurance for himself and his wife under the Company's benefit plan. *Id*. at ¶ 46. The claims conflicted with Defendant Razin's contemporaneous claims that he was an independent director of the Company. Mr. Davis proposed an independent investigation of the issue. *Id*. The proposal was seconded by Mr. Hussein but was voted down by Defendant Razin and the directors aligned with him. Defendant Razin cast the deciding vote and did not recuse himself despite being self-interested. *Id*. Notably, Mr. Davis was not nominated for re-election to the Company's Board.

143.  Similar to the health benefits he put in place for himself, Defendant Razin had the Board approve a resolution under which he and his wife would receive life insurance benefits. *Id*. at ¶ 47. Defendant Razin had the Company's corporate counsel draft the resolution without getting prior authorization from the

1   Board to do so, and the arrangement contravenes the Company's 2000 severance

2   agreement with him under which he was only to receive insurance for three years

3   following his termination. *Id.* at ¶ 40.

4   144.   Defendant Razin's wrongful conduct includes his oversight of the

5   Proxy Materials. The Company's SEC filings state the following with respect to

6   the Special Committee appointed to investigate the alleged wrongdoing:

7   We have recently been subject to proxy contests, the use of

8   cumulative voting rights and litigation brought against us by a

9   former director, Mr. Hussein. In light of this history, on May 26,

10   2010, our Board formed a Special Committee to address matters of

11   this type. Among other things, the Special Committee has been

12   authorized to act on our Board's behalf in connection with the

13   solicitation and voting of proxies at the annual meeting, except

14   where the Proxy Voting Committee has been authorized to act, as

15   well as all matters related to any litigation or threat of litigation

16   associated with such meeting and its related activities. The Special

17   Committee currently consists of Messrs. Razin, Barbarosh, Bristol,

18   Pflueger and Rosenzweig.

19   145.   Defendant Razin formed the Special Committee only with directors

20   who were closely aligned and chosen by him. *Id.* at ¶ 60. Defendant Razin

21   chaired the Special Committee and signed the Company's proxy materials on

22   behalf of the Special Committee. *Id.* Thus, there was no check to Defendant

23   Razin incorporating the misleading guidance in the Company's Proxy Materials.

24   **X.   THE DIRECTOR DEFENDANTS BREACHED THEIR DUTY OF**

25   **LOYALTY BY GRANTING THEMSELVES UNLAWFUL AMENDED**

**INDEMNIFICATION AGREEMENTS SHORTLY AFTER**

26   **ENGAGING IN THE WRONGFUL CONDUCT**

27   146.   Prior to engaging in the unlawful conduct alleged herein, the

28   Individual Defendants were subject to an indemnification agreement with the

Company which they had signed in 2010.  QSI is a California corporation, and the 2010 indemnification agreement already provided for indemnification "to the fullest extent permitted by [California] law."

147.  However, after engaging in the egregious and unlawful conduct alleged herein, and fearing personal liability for such conduct, the Individual Defendants, who control QSI, caused QSI in January 2013 to amend those indemnification agreements to provide even *further* indemnification rights. Obviously, since the 2010 agreements already provided for indemnification "to the fullest extent permitted by [California] law," the 2013 amended indemnification agreements could, by definition, only increase defendants' indemnification rights by burdening the Company with obligations beyond those permitted under California law.

148.  On January 28, 2013, just twelve days after QSI had filed a Form 8-K disclosing Director Cline's resignation (effective "immediately"), QSI filed another Form 8-K announcing that it had entered into amended indemnification agreements *on January 23, 2013* with Defendants Sheldon Razin, Paul Holt, and Steven Plochocki – the very defendants who were thereafter sued by the Company's shareholders for securities fraud, and as to whom the Ninth Circuit recently found that the securities fraud complaint had adequately alleged "with great specificity" the scienter of such defendants when making false and misleading statements to the public about QSI.  The Form 8-K filed by QSI stated explicitly that the Board itself had approved the amended indemnification agreements. For good measure, the Board not only gave the amended indemnification rights to Razin, Holt, and Plochocki, but also to themselves – *i.e.*, to Defendants Craig Barbarosh, George Bristol, Russell Pflueger, and Lance Rosenzweig. Other key executive officers also received the augmented indemnification rights, including Mark Davis, Daniel Morefield, Donn Neufeld, Stephen Puckett, Monte Sandler and James Sullivan.  The amended

indemnification agreements violated California law because they purported to impose greater indemnification obligations on QSI then permitted under California law and because the amended agreements did not comply with the California Corporations Code.

## XI.    THE DIRECTOR DEFENDANTS BREACHED THEIR DUTIES OF GOOD FAITH AND LOYALTY BY AWARDING INCENTIVE COMPENSATION TO DEFENDANTS PLOCHOCKI AND HOLT NOTWITHSTANDING THE DEFENDANTS' WRONGDOING

149.   Defendants Barbarosh and Pflueger acted in bad faith and in a disloyal manner because, as members of the Compensation Committee in 2012, they awarded Defendants Plochocki and Holt excessive incentive compensation for fiscal year 2012, and thereafter failed to clawback such compensation, as well as Plochocki's illegal insider sales proceeds. They, along with their fellow Directors, have done nothing to seek the return of this compensation that was earned while Plochocki and Holt issued false and misleading statements to the market regarding the Company's financial performance and guidance.

150.   On June 25, 2012, QSI filed a Proxy Statement in which it detailed the compensation awarded to Plochocki and Holt for fiscal year 2012 (which ended March 31, 2012). The Proxy noted that:

> Under our Fiscal Year 2012 Incentive Program, our executives are awarded cash and equity incentives based on (i) the percentage of increase, if any, of the Company's consolidated revenues reported for the fiscal year over the Company's consolidated revenues reported for the previous fiscal year ("Consolidated Revenue Growth") and (ii) the percentage of increase, if any, of the Company's fully diluted earnings per share reported for the fiscal year over the Company's fully diluted earnings per share reported for the previous fiscal year ("EPS Growth").

151.   The Proxy further represented that Fiscal Year 2012 had been a "strong year" for QSI:

<u>Our Fiscal Year 2012 Performance and How our Performance is Linked to Pay</u>

Fiscal year 2012 was a strong year for Quality Systems, financially and operationally. As shown in the table below, we have continued our pattern of financial growth and increased shareholder return.

| *in millions, except per share data*[5] | **2009** | **2010** | **2011** | **2012** |
|---|---|---|---|---|
| Reported consolidated revenue | $245.5 | $291.8 | $353.4 | $429.8 |
| Net Income | $ 46.1 | $ 48.4 | $ 61.6 | $ 75.7 |
| Fully diluted earnings per share | $ 0.81 | $ 0.84 | $ 1.06 | $ 1.28 |
| Dividends | | | | |
|     Total dividends paid | $ 30.8 | $ 34.3 | $ 34.7 | $ 41.0 |
|     Total dividends paid per share | $ 0.58 | $ 0.60 | $ 0.63 | $ 0.70 |
| Cash and marketable securities at March 31 | $ 70.2 | $ 91.8 | $117.7 | $139.4 |

152.   The Proxy further stated that: "Under our Fiscal Year 2012 Incentive Program, cash bonuses payable to our named executive officers were between 0% and 50% of their respective annual base salaries, and equity incentives payable to our named executive officers were between zero (-0-) and 50,000 stock options. The payment of these incentive awards was based on the Company's attainment of pre-established financial performance goals. In fiscal year 2012 (excluding acquisitions made during the fiscal year), the Company achieved Consolidated Revenue Growth of 19.6%, or 50% of the Consolidated Revenue Growth target, and EPS Growth of 20.8%, or 60% of the EPS Growth target. Based on this Company performance, the cash bonus payout to each of our named executive officers was, on average, 27.5% of their respective base salaries, or 55% of the potential cash bonus amount. The number of stock options granted to each of our named executive officers was, on average, 18,700 options, or 55% of the potential grant amount."

///

---

[5] Per share amounts have been restated for all applicable periods to reflect the two-for-one stock split of QSI's common stock, effective October 26, 2011.

153.   The Proxy further detailed the payouts to the Company's executives that the Compensation Committee (Defendants Barbarosh and Pflueger) had approved:

On May 23, 2012, based on our results for the 2012 fiscal year, our Compensation Committee authorized the award of the following cash and equity incentive payments under the Fiscal Year 2012 Incentive Program:

<u>Cash and Equity Bonus Determinations under the Fiscal Year 2012 Incentive Program</u>

| Name | Potential Cash Bonus | Cash Bonus Earned | Potential Equity Bonus | Equity Bonus Earned |
|---|---|---|---|---|
| Steven T. Plochocki | $275,000 | $151,250 | 50,000 | 27,500 |
| Paul A. Holt | 165,000 | 90,750 | 30,000 | 16,500 |
| Patrick B. Cline [(1)] | 850,000 | 415,537 | 90,000 | — |
| Scott Decker | 185,500 | 102,025 | 30,000 | 16,500 |
| Donn E. Neufeld | 150,000 | 82,500 | 30,000 | 16,500 |
| Monte Sandler | 145,000 | 79,750 | 30,000 | 16,500 |

154.   The Proxy also contained the following chart listing total compensation awarded to the Company's executives in fiscal year 2012:

| Title | Fiscal Year | Salary ($) | Bonus ($) | Stock Awards ($) | Option Awards ($) [(1)] | Non-Equity Incentive Plan Compensation ($) [(2)] | Change in Pension Value and Nonqualified Deferred Compensation Earnings ($) [(3)] | All Other Compensation ($) [(4)] | Total ($) |
|---|---|---|---|---|---|---|---|---|---|
| Steven T. Plochocki | | | | | | | | | |
| Chief Executive | 2012 | $ 539,688 | $— | $ — | $ 236,748 | $ 151,250 | $ — | $ — | $ 927,686 |
| Officer and | 2011 | 522,500 | — | — | 322,476 | 156,750 | — | — | 1,001,726 |
| President [(5)] | 2010 | 504,688 | — | — | — | 25,000 | — | — | 529,688 |
| Paul A. Holt | | | | | | | | | |
| Executive Vice | 2012 | 323,750 | — | — | 142,049 | 90,750 | 4,118 | 17,113 | 577,780 |
| President and | 2011 | 303,394 | — | — | 161,238 | 93,000 | 3,481 | 16,628 | 577,741 |
| Chief Financial | 2010 | 284,475 | — | — | — | 50,000 | 3,345 | 2,116 | 339,936 |
| Officer | | | | | | | | | |
| Patrick B. Cline | 2012 | 708,639 | — | — | — | 413,667 | 7,617 | 133 | 1,130,056 |
| Former | 2011 | 800,000 | — | — | 938,244 | 628,571 | — | 15,956 | 2,382,771 |
| President [(5)(6)] | 2010 | 750,000 | — | — | 283,605 | 376,766 | 5,625 | 4,229 | 1,420,225 |
| Scott Decker | | | | | | | | | |
| President, | 2012 | 357,392 | — | — | 142,049 | 102,025 | 3,521 | 15,429 | 620,416 |
| NextGen | 2011 | 350,000 | — | — | 241,857 | 105,000 | 3,500 | 15,373 | 715,730 |
| Healthcare [(6)] | 2010 | 302,881 | — | — | 493,625 | 116,325 | 875 | 1,949 | 915,655 |

155.   The compensation noted above was only paid to Defendants Plochocki and Holt because Plochocki and Holt withheld material adverse information about the Company's financial performance from the market.

156.   Once the truth was revealed, QSI reported abysmal numbers for fiscal year 2013.  As a result, QSI's Compensation Committee did not award any incentive compensation to Defendants Plochocki and Holt in fiscal year 2013.

157.   By the time QSI's 2013 Proxy Statement was filed, Defendant Rosenzweig had been added as a member of the Compensation Committee, and the Committee was comprised of Defendants Barbarosh, Rosenzweig and Pflueger.  As the Company's Proxy, filed July 1, 2013, disclosed:

> For purposes of the 2013 Executive Compensation Program, Consolidated Revenue Growth was 3.7% based on revenue of approximately $445.9 million compared to revenue of $429.8 million for fiscal year 2012. Consolidated EPS declined 46.0% based on EPS of approximately $0.69 compared to EPS of $1.28 for fiscal year 2012. Consolidated revenue and EPS for fiscal year 2013 excluded $14.4 million and $0.03, respectively, from the acquisitions of Matrix Management Solutions, LLC and The Poseidon Group.
>
> **On May 22, 2013, based on our results for the 2013 fiscal year and the terms of the 2013 Executive Compensation Program, our Compensation Committee did not authorize any cash or equity incentive payments to our NEOs.**

158.   The 2013 Proxy also noted that QSI had a policy against unlawful insider trading and also had a policy permitting the Company to recoup incentive compensation from its executives:

> *Insider Trading Policy*
>
> We have an insider trading policy that generally prohibits Board members, officers and employees from engaging in short-term or speculative transactions in our Company's shares, including short sales, publicly traded options, hedging transactions, holding

Company shares in a margin account, pledging Company shares as collateral and standing and limit orders.

*Clawback Policy for Compensation Recovery*

In order to better align our executives' long-term interests with those of our Company and our shareholders, we have an executive compensation recovery policy that claws back incentive compensation awarded to an executive officer if the result of a performance measure upon which such award was based is subsequently restated or otherwise adjusted in a manner that would reduce the size of the award. If the result of a performance measure was considered in determining the award, but the award was not made on a formulaic basis, the Compensation Committee will determine the appropriate amount of the recovery. In addition, the Compensation Committee has the authority to recover incentive compensation if an executive officer engaged in intentional misconduct that contributed to an award of incentive compensation that was greater than would have been awarded in the absence of such misconduct.

159. Despite the Proxy's admission that QSI had an insider trading prohibition and a policy to claw back incentive compensation, the Director Defendants (including Defendants Barbarosh, Rosenzweig and Pflueger, who served on the Compensation Committee at the time), did nothing to seek redress against Defendant Plochocki for his blatantly unlawful insider selling of QSI stock during fiscal year 2012. Such Defendants also did nothing to claw back the compensation awarded to Defendants Plochocki and Holt in Fiscal Year 2012, even though they were well aware of such defendants' wrongdoing by the time the 2013 proxy was filed with the SEC on July 1, 2013.

## XII. THE DIRECTOR DEFENDANTS BREACHED THEIR DUTIES OF GOOD FAITH AND LOYALTY BY ALLOWING PLOCHOCKI TO RESIGN RATHER THAN FIRING HIM FOR CAUSE AND SUING HIM

160. Rather than protecting the Company's interests by suing Plochocki for his wrongful conduct, the Board demonstrated its allegiance to Plochocki by allowing him to resign rather than firing him for cause, and then thanking him for his service in a press release issued on June 4, 2015: "Sheldon Razin, founder and chairman of the board, added: 'The entire Quality Systems team, along with the Board, thanks Steve for his years of distinguished leadership and service. He has helped define and shape Quality Systems into the global HCIT leader it has become.'"

161. Indeed, when Quality Systems filed its Proxy Statement on July 2, 2015, the extent of the Board's lavish send-off of Mr. Plochocki was disclosed. As the Proxy admitted, the Board went out of its way to give Mr. Plochocki even more money than he was contractually entitled to under his employment agreement. The Proxy stated:

*Separation Agreement with Mr. Plochocki*

*Mr. Plochocki was previously subject to an employment agreement which would have provided for payments to Mr. Plochocki in connection with any termination of employment, change-in-control, or change in responsibilities assuming a March 31, 2015 date, however, **the terms of such employment agreement were superseded by a separation agreement entered into in connection with his resignation**. Detailed information about the payments made to Mr. Plochocki in connection with his separation agreement is presented above under the caption "Grants of Plan-Based Awards for Fiscal Year Ended March 31, 2015-Separation Agreement with Mr. Plochocki."*

162.   The 2015 Proxy detailed the payments to Plochocki that the Board had authorized as follows:

*Separation Agreement with Mr. Plochocki*

In connection with Mr. Plochocki's resignation from his positions as President and Chief Executive Officer of the Company on June 30, 2015, the Company entered into a separation agreement with Mr. Plochocki on June 24, 2015. Pursuant to the separation agreement, Mr. Plochocki received a lump sum separation payment of $618,000 and a lump sum prorated non-employee director Board fee of $9,424 for his service on the Board from June 30, 2015 through the date of our 2015 annual meeting of shareholders.

Provided that Mr. Plochocki makes a timely election for continued coverage pursuant to COBRA, the separation agreement provides that the Company will reimburse Mr. Plochocki for his and his spouse's continued coverage under the Company's group health care plan until June 30, 2016 (or until such earlier date as Mr. Plochocki becomes eligible for coverage under another employer's group health care plan).

Pursuant to the separation agreement, subject to the Company's attainment of applicable performance goals for the full fiscal year ending March 31, 2016, Mr. Plochocki is eligible to receive a cash payment equal to the prorated value of his cash and equity bonuses payable under the 2015 Executive Compensation Program and the 2016 Executive Compensation Program that are tied to the Company's fiscal year 2016 performance.

The separation agreement provides that, the 20,000 shares of the Company's common stock that were unvested under Mr. Plochocki's June 3, 2014 option grant (which have an exercise price of $15.99

per share) vested on June 30, 2015. These and the other vested stock options held by Mr. Plochocki will expire if not exercised on or before the three month anniversary of June 30, 2015.

163.   The Company did not disclose in the 2015 Proxy whether the Board gave Plochocki a release of liability for his misconduct.  However, the Proxy does disclose that the Board caused the Company to enter into a formal "Separation Agreement" with Plochocki.  Since such agreements typically contain releases, upon information and belief the Board wrongfully attempted to release Plochocki from liability for certain claims in the Separation Agreement.

## XIII.  DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

164.   Plaintiff brings this action derivatively in the right and for the benefit of Quality Systems to redress injuries suffered, and to be suffered, by Quality Systems as a direct result of the breaches of fiduciary duty, abuse of control, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants. Quality Systems is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction in this Court that it would not otherwise have.

165.   Plaintiff will adequately and fairly represent the interests of Quality Systems and its shareholders in enforcing and prosecuting its rights.

166.   Plaintiff is an owner of Quality Systems common stock and was an owner of Quality Systems common stock at all times relevant to the Individual Defendants' wrongful course of conduct alleged herein.

167.   At the time that this action was commenced, the Board consisted of the following nine directors: Craig A. Barbarosh, George H. Bristol, James C. Malone, Morris Panner, Sheldon Razin, Lance E. Rosenzweig, Rusty Frantz, Jeffrey H. Margolis, and Julie Klapstein.

168.   As a result of the facts set forth herein, Plaintiff did not make any demand on the Quality Systems Board to institute this action against the

Individual Defendants. Such demand would have been a futile and useless act with respect to each and every one of the Individual Defendants because they are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action for the following reasons.

169.   A majority of the Board lacks independence because they breached their duty of loyalty to the Company and acted in bad faith by preferring the interests of Defendants Razin, Plochocki and Holt over those of the Company, and by demonstrating hostility towards the claims asserted herein.  For example, on June 4, 2015, the Board issued a press release announcing that it was allowing Defendant Plochocki to retire rather than suing him for the false statements he made concerning Quality System's financial results.

170.   The directors at the time Plochocki was allowed to retire, rather than being fired for cause and sued for his breaches of fiduciary duty, included a majority of the current board:  Barbarosh, Bristol, Razin, Malone, Margolis, Panner, and Rosenzweig.[6]

171.   Indeed, rather than protecting the Company's interests by suing Plochocki for his wrongful conduct, the Board and Defendant Razin demonstrated its allegiance to Plochocki by thanking him for his service in the press release issued on June 4, 2015:  "Sheldon Razin, founder and chairman of the board, added: 'The entire Quality Systems team, along with the Board, thanks Steve for his years of distinguished leadership and service. He has helped define and shape Quality Systems into the global HCIT leader it has become.'"

172.   Indeed, when Quality Systems filed its Proxy Statement on July 2, 2015, the extent of the Board's lavish send-off of Mr. Plochocki was disclosed. As the Proxy admitted, the Board went out of its way to give Mr. Plochocki even

---

[6] Defendant Pflueger, who recently retired from the Board in late August 2017, was also on the Board at the time.

more money than he was contractually entitled to under his employment agreement.  The Proxy stated:

> *Separation Agreement with Mr. Plochocki*
>
> *Mr. Plochocki was previously subject to an employment agreement which would have provided for payments to Mr. Plochocki in connection with any termination of employment, change-in-control, or change in responsibilities assuming a March 31, 2015 date, however,* **the terms of such employment agreement were superseded by a separation agreement entered into in connection with his resignation**. *Detailed information about the payments made to Mr. Plochocki in connection with his separation agreement is presented above under the caption "Grants of Plan-Based Awards for Fiscal Year Ended March 31, 2015-Separation Agreement with Mr. Plochocki."*

173.   The Board of Directors also lacks independence because they are beholden to Defendant Razin. As set forth in detail above, Defendant Razin stands to personally benefit from the ways in which he controls Quality System's operations to the detriment of Quality Systems and its shareholders, and has surrounded himself with a complicit board that will aid him in his self-interested pursuits.

174.   Defendant Razin is not independent and disinterested because he is a defendant in the related securities fraud class action lawsuit.   He faces a substantial likelihood of liability in that case because the 9th Circuit has upheld the legal sufficiency of the claims pled against Razin, and held that the facts alleged demonstrate Razin's scienter regarding the falsity of the statements he caused QSI to make, as alleged herein.

175.   Defendant Razin is not independent as he is the Company's largest shareholder. As of July 2017, Razin held 10,235,650 shares of Company stock --

16.2% of all outstanding shares. Moreover, he chairs the Special Committee responsible for the misleading guidance contained in the Company's Proxy Materials, signed the Proxy Materials and signed the June 26, 2012 letter containing misleading guidance.

176. Defendants Barbarosh, Bristol, and Rosenzweig are likewise not independent as they sit on the Special Committee that was responsible for the Company's Proxy Materials and all signed the June 26, 2012 letter containing misleading guidance.

177. A majority of the current Board is *interested* because they face a substantial likelihood of liability for approving the amendments to QSI's indemnification agreements with Defendants Razin, Plochocki, Holt, Barbarosh, Bristol, Pflueger and Rosenzweig in January 2013, as alleged herein. Those amendments did not comply with California law and were made at a time when the Board knew that it and Razin, Plochocki, and Holt had *already* breached their fiduciary duties to QSI. Defendants Razin, Barbarosh, Bristol, and Rosenzweig were members of the Board at the time. The Company filed a Form 8-K on January 28, 2013 announcing that the Board itself had approved these self-interested amended indemnification agreements. The Form 8-K admitted that:

The Company entered into an Indemnification Agreement with each of Craig Barbarosh, George Bristol, Mark Davis, Paul Holt, Daniel Morefield, Donn Neufeld, Russell Pflueger, Steven Plochocki, Stephen Puckett, Sheldon Razin, Lance Rosenzweig, Monte Sandler and James Sullivan on January 23, 2013, and with Ahmed Hussein on January 25, 2013. *The Company's board of directors (the "Board") has approved, following the recommendation of the Nominating and Governance Committee of the Board, the form of Indemnification Agreement. Each of the Indemnification Agreements replaces and supersedes the indemnification agreements previously entered into with such individuals*, the form of which was filed

as Exhibit 10.3 to the Company's Current Report on Form 8-K filed with the Securities and Exchange Commission on February 2, 2010.

178.   A majority of the current Board is interested, and faces a substantial likelihood of liability for causing the Company to file the false and misleading statements in 2011 and 2012.  The Directors who engaged in this bad faith and disloyal conduct include Defendants Razin, Rosenzweig, Bristol, and Barbarosh.

179.   Director Rusty Frantz is not independent, as the Company admits in its Proxy. The principal professional occupation of director Frantz is his employment with Quality Systems as its CEO, pursuant to which he has received and continues to receive substantial monetary compensation and other benefits. Thus, director Frantz lacks independence from demonstrably interested directors, rendering him incapable of impartially considering a demand to commence and vigorously prosecute this action. Quality Systems' 2017 Proxy Statement filed with the SEC on Form 14A admits Frantz is not independent:  "Mr. Frantz, our President and Chief Executive Officer, is a member of our management team and is not independent."[7]  Frantz was awarded over \$4 million in compensation in fiscal year 2017, as reflected in the following chart:

| Name and Title | Fiscal Year | Salary ($) | Bonus ($) | Stock Awards ($) [1] | Option Awards ($) [1] | Non-Equity Incentive Plan Compensation ($) [2] | Change in Pension Value and Nonqualified Deferred Compensation Earnings ($) [3] | All Other Compensation ($) [4] | Total ($) |
|---|---|---|---|---|---|---|---|---|---|
| Rusty Frantz President and | 2017 | $600,008 | $  — | $1,226,961 | $1,967,000 | $420,000 | $      8,363 | $34,785 | $ 4,257,117 |

180.   The Director Defendants were actively involved in QSI's risk management, and received regular reports concerning risks facing the Company. As a result, they had knowledge of the wrongdoing alleged herein and yet, in bad faith, caused the Company to engage in the wrongful conduct.  QSI's 2013 Proxy

---

[7] See Quality System's Form 14A filed July 13, 2017.

Statement commented on the Board's involvement in risk management and the regular reports provided to the Board:

> *Board Involvement in Risk Oversight*
>
> Our Board is actively engaged, as a whole, and also at the committee level, in overseeing management of our risks. Our Board regularly reviews information regarding our personnel, liquidity and operations, as well as the risks associated with each. Our Compensation Committee is responsible for overseeing the management of risks relating to our executive compensation plans and arrangements. Our Audit Committee oversees management of financial risks and potential conflicts of interest. Our Nominating and Governance Committee manages risks associated with the independence and qualifications of our directors. Our Transaction Committee oversees management of risks associated with the acquisition of significant new business enterprises. While each committee is responsible for evaluating certain risks and overseeing the management of such risks, our entire Board is regularly informed through committee reports about such risks and matters which may evolve into risks.

181. Defendants Barbarosh, Pflueger, and Rosenzweig are not independent, and acted in bad faith, because as members of the Compensation Committee in 2012 and/or 2013, they awarded Defendants Plochocki and Holt excessive incentive compensation for the applicable years, and/or failed to clawback such compensation, as well as Plochocki's illegal insider sales proceeds. They, along with their fellow Directors, have done nothing to seek the return of this compensation that was earned while Plochocki and Holt issued false and misleading statements to the market regarding the Company's financial performance and guidance. The 9th Circuit Court of Appeals has already found that the allegations of the securities fraud class action complaint adequately alleged scienter on the part of Plochocki and Holt. *See City of Miami v. Quality*

1 *Sys.*, 2017 U.S. App. LEXIS 13708, at \*32-\*34 ("a showing of scienter specific to

2 Plochocki is reinforced by his sale of 87 percent of his QSI stock holdings on

3 February 24, 2012, netting him proceeds of more than seven times his FY 2012

4 salary... Plochocki's massive and uncharacteristic sale in February, made near the

5 apogee of QSI's stock price during the Class Period, and shortly before the stock

6 went into a steep decline (bottoming out on July 26, 2012) is, to say the least,

7 suspicious.").

8    182.   The 2013 Proxy also noted that QSI had a policy against unlawful

9 insider trading and also had a policy permitting the Company to recoup incentive

10 compensation from its executives:

11    *Insider Trading Policy*

12        We have an insider trading policy that generally prohibits

13    Board members, officers and employees from engaging in short-term

14    or speculative transactions in our Company's shares, including short

15    sales, publicly traded options, hedging transactions, holding

16    Company shares in a margin account, pledging Company shares as

17    collateral and standing and limit orders.

18    *Clawback Policy for Compensation Recovery*

19        In order to better align our executives' long-term interests with

20    those of our Company and our shareholders, we have an executive

21    compensation recovery policy that claws back incentive

22    compensation awarded to an executive officer if the result of a

23    performance measure upon which such award was based is

24    subsequently restated or otherwise adjusted in a manner that would

25    reduce the size of the award. If the result of a performance measure

26    was considered in determining the award, but the award was not

27    made on a formulaic basis, the Compensation Committee will

28    determine the appropriate amount of the recovery. In addition, the

Compensation Committee has the authority to recover incentive compensation if an executive officer engaged in intentional misconduct that contributed to an award of incentive compensation that was greater than would have been awarded in the absence of such misconduct.

183.   Despite the Proxy's admission that QSI had an insider trading prohibition and a policy to claw back incentive compensation, the Director Defendants (including Defendants Barbarosh, Rosenzweig and Pflueger, who served on the Compensation Committee in 2013), did nothing to seek redress against Defendant Plochocki for his blatantly unlawful insider selling of QSI stock during fiscal year 2012.  Such Defendants also did nothing to claw back the compensation awarded to Defendants Plochocki and Holt in Fiscal Year 2012, even though they were well aware of such defendants' wrongdoing by the time the 2013 proxy was filed with the SEC on July 1, 2013.

184.   During the Relevant Time Period Defendants Barbarosh, Pflueger, and Rosenzweig were members of the Compensation Committee, and failed and continue to fail to take any action to clawback compensation awarded to Defendants Plochocki and Holt that was paid to such Defendants notwithstanding such Defendants' intentional wrongdoing.  Barbarosh and Rosenzweig, who still serve on the Compensation Committee, continue to do nothing to claw back the compensation awarded to Plochocki and Holt,  including Plochocki's proceeds from his illegal insider selling – even after the Ninth Circuit described Plochocki's insider selling as highly suspicious and sufficient to indicate scienter. Directors Barbarosh and Rosenzweig have thus acted in bad faith and in a disloyal manner because they have acted to protect themselves and Defendants Plochocki and Holt from liability rather than pursue valuable claims the Company possesses against them.  Their conduct also demonstrates they are hostile to the claims asserted herein.  Therefore, Defendants Barbarosh and Rosenzweig are not

independent and face a substantial likelihood of liability for breaching their fiduciary duties of good faith and loyalty to the Company; demand is therefore futile as to such Directors.

185. Defendant Bristol served as Chair of the Company's Audit Committee during the Relevant Time Period. He was designated as an "Audit Committee Financial Expert" by QSI and had a heightened duty to ensure the accuracy in the Company's financial reporting. As Chair of the Audit Committee, Bristol was required, pursuant to the Audit Committee's Charter, to "[r]eview and discuss with management and the independent auditor the Company's quarterly financial statements prior to the filing of its Form 10-Q, including the results of the independent auditor's review of the quarterly financial statements."

186. Moreover, as confirmed by former Director Hussein's verified complaint, Defendant Razin repeatedly overrode the existing internal controls at QSI, acted as the de facto CEO, and caused management to make forecasts that lacked any reasonable basis. Audit Committee member Bristol knew or recklessly disregarded this misconduct, and yet knowingly caused QSI to file statements which misrepresented to the public and SEC that QSI had adequate, effective, and functioning internal controls in place during the Relevant Period. By causing QSI to make these misrepresentations, and by failing to correct them, Defendant Bristol breached his duties of good faith, candor, and loyalty to QSI. As a result, he faces a substantial likelihood of liability and is interested. Demand is thus excused as to Bristol.

187. Each member of the Board faces a substantial likelihood of liability for breaching their fiduciary duties of loyalty and good faith as alleged herein, and are therefore incapable of disinterestedly and independently considering a demand to commence and vigorously prosecute this action.

///

///

# XIV.  CAUSES OF ACTION

## COUNT I
## AGAINST ALL INDIVIDUAL DEFENDANTS
## FOR BREACH OF FIDUCIARY DUTY

188.  Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

189.  As alleged in detail herein, each of the Individual Defendants had a duty to ensure that Quality Systems disseminated accurate, truthful and complete information to its shareholders.

190.  The Individual Defendants violated their fiduciary duties of care, loyalty, and good faith by causing or allowing the Company to disseminate materially misleading and inaccurate information to QSI's shareholders through, *inter alia*, press releases, SEC filings, and other public statements and disclosures as detailed herein. The Defendants knew or recklessly disregarded that their public statements were false and misleading.  With respect to the false statements made in connection with the Proxy filed in connection with the Company's annual meeting, the Defendants failed to correct the false statements even after the SEC sent multiple letters to the Company questioning the truthfulness of the statements and requesting that additional disclosures be provided to the Company's shareholders. These actions were not a good faith exercise of prudent business judgment, and indeed constituted bad faith and a breach of the duty of candor and loyalty.  Because breaches of the fiduciary duties of candor, loyalty, and good faith cannot be indemnified by a California corporation, the Individual Defendants face a substantial likelihood of personal liability for their misconduct.

191.  During the Relevant Time Period, the Individual Defendants also failed to cause QSI to adopt and implement an effective system of internal controls, and knowingly or recklessly allowed Defendants Plochocki, Holt and Razin to override and violate the deficient internal controls that did exist.  These

actions were not a good faith exercise of prudent business judgment, and indeed constituted bad faith and a breach of the duty of candor and loyalty.  Because breaches of the fiduciary duties of candor, loyalty, and good faith cannot be indemnified by a California corporation, the Individual Defendants face a substantial likelihood of personal liability for their misconduct.

192.  As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, the Company has suffered significant damages, as alleged herein.

## COUNT II
## AGAINST ALL INDIVIDUAL DEFENDANTS FOR
## ABUSE OF CONTROL

193.  Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

194.  The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Quality Systems, for which they are legally responsible. In particular, the Individual Defendants abused their positions of authority by causing or allowing Quality Systems to misrepresent material facts regarding its financial position and business prospects and by engaging in insider trading, allowing others to engage in insider trading, and failing to seek recoupment of insider trading proceeds and incentive compensation from Plochocki and Holt.

195.  As a direct and proximate result of the Individual Defendants' abuse of control, Quality Systems has sustained significant damages.

196.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

197.  Plaintiff, on behalf of Quality Systems, has no adequate remedy at law.

///

## COUNT III
## AGAINST DEFENDANTS RAZIN, PLOCHOCKI AND HOLT FOR UNJUST ENRICHMENT

198.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

199.   By their wrongful acts and omissions, Defendants Razin, Plochocki, and Holt were unjustly enriched at the expense of and to the detriment of Quality Systems.

200.   Plaintiff, as a shareholder and representative of Quality Systems, seeks restitution from Defendants Razin, Plochocki and Holt and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by Defendants.

## COUNT IV
## AGAINST DEFENDANT PLOCHOCKI FOR BREACH OF FIDUCIARY DUTY FOR INSIDER SELLING

201.   Plaintiff incorporates by reference each of the preceding paragraphs as though they were set forth in full herein.

202.   During the term of the wrongdoing alleged herein, Defendant Plochocki occupied positions with the Company that made him privy to confidential, proprietary information concerning the Company's financial condition and future business prospects. The foregoing information was a proprietary asset belonging to the Company, which he used for his own benefit and to the detriment of the Company and its shareholders. Notwithstanding his duty to refrain from trading in Quality Systems' common stock while in possession of material non-public information, Defendant Plochocki sold QSI stock at inflated prices while he was in the possession of material non-public information concerning QSI and its financial results.

203.   The adverse, non-public material information regarding the Company's current and future earnings prospects was proprietary information

which belonged to the Company. By engaging in unlawful insider selling, Defendant Plochocki misused the Company's proprietary information for his own benefit. Since the use of the Company's information for his own gain constitutes a breach of fiduciary duty, the Company is entitled to the imposition of a constructive trust on the profits Defendant Plochocki received from his insider sales.

204.   As a result of his misconduct, Defendant Plochocki is liable to the Company.

## XV.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A.   Against all the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties;

B.   Awarding to Quality Systems restitution from the Individual Defendants, and ordering disgorgement of all profits, benefits and other compensation obtained by the Individual Defendants;

C.   Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses;

D.   Ordering Quality Systems to implement enhanced corporate governance reforms and internal control procedures; and

E.   Granting such other and further relief as the Court deems just and proper.

///

///

///

///

# XVI.  JURY DEMAND

Plaintiff demands a trial by jury.

Dated:  September 28, 2017

Respectfully submitted,

BOTTINI & BOTTINI, INC.
Francis A. Bottini, Jr.
Albert Y. Chang
Yury A. Kolesnikov

s/ Francis A. Bottini, Jr.
Francis A. Bottini, Jr.

7817 Ivanhoe Avenue, Suite 102
La Jolla, California  92037
Telephone:   (858) 914-2001
Facsimile:    (858) 914-2002

*Attorneys for Plaintiff*

## VERIFICATION

I, Kusumam Koshy, verify that I am a current shareholder of nominal defendant Quality Systems, Inc. ("QSI"), that I owned QSI stock at the time of the transactions alleged in the complaint, and that I have continuously owned QSI stock since 2007.  I have reviewed the allegations in this Shareholder Derivative Complaint (the "Complaint"). As to those allegations of which I have personal knowledge, I believe them to be true; as to those allegations of which I lack personal knowledge, I rely upon my counsel and counsel's investigation, and believe them to be true. Having received a copy of the Complaint and reviewed it with counsel, I authorize its filing.

I declare under penalty of perjury that the foregoing is true and correct. Executed on

9/25/2017
_____



_____

Kusumam Koshy